WMP/DK:JN/AS
F. #2016R00709



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA | **I N F O R M A T I O N** |
| - against – | Cr. No. <u>16-643 (RJD)</u> |
| ODEBRECHT S.A., | (T. 18, U.S.C., §§ 371 and 3551 <u>et seq</u>.) |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

THE UNITED STATES CHARGES:

At all times relevant to this Information, unless otherwise stated:

I.      The Foreign Corrupt Practices Act

1.      The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, <u>et seq</u>. (the "FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

II.      Relevant Entities and Individuals

2.      Defendant ODEBRECHT S.A. was a Brazilian holding company that, through various operating entities (collectively "ODEBRECHT"), conducted business in multiple industries, including engineering, construction, infrastructure, energy, chemicals, utilities and real estate.  ODEBRECHT S.A. had its headquarters in Salvador, state of Bahia, Brazil, and operated in 27 other countries, including the United States.

3.      Construtora Norberto Odebrecht ("CNO") was a Brazilian-based subsidiary of ODEBRECHT S.A. CNO was responsible for carrying out projects in Brazil related to transport and logistics, energy, sanitation, urban development and public and corporate construction. CNO housed a unit called the Division of Structured Operations, which, as described below, was created to allow ODEBRECHT to make unrecorded payments, many of which took the form of bribes to government officials in Brazil and abroad.

4.      Braskem S.A. ("Braskem"), a *sociedade anônima* (corporation) organized under the laws of Brazil and headquartered in São Paulo, Brazil, was one of the largest petrochemical companies in the Americas, producing a portfolio of petrochemical and thermoplastic products. ODEBRECHT S.A. owned 50.11% of the voting shares and 38.1% of the total share capital of Braskem and effectively controlled the company. Petróleo Brasileiro S.A. – Petrobras ("Petrobras"), Brazil's national oil company, owned 36.1% of the shares of Braskem. American depositary shares of Braskem traded on the New York Stock Exchange, and Braskem was required to file annual reports with the United States Securities and Exchange Commission (the "SEC") under Section 15(d) of the Exchange Act, Title 15, United States Code, Section 78o(d). Braskem was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(a) and 78m(b).

5.      Smith & Nash Engineering Company ("S&N"), an unaffiliated shell company based in the British Virgin Islands, was established and managed at the Division of Structured Operations' direction. S&N was used by ODEBRECHT to further the bribery scheme, and to conceal and disguise improper payments made to, and for the benefit of, foreign officials and foreign political parties in various countries. S&N opened at least one offshore

2

bank account (the "S&N Account") on behalf of ODEBRECHT. ODEBRECHT transferred

money from various bank accounts, including several New York-based bank accounts (the "New

York-based Accounts"), to the S&N Account. The funds in the S&N Account were then used, in

part, to make direct and indirect bribe payments to foreign officials. A United States citizen and

resident of New York and Florida was the authorized signatory on the S&N Account.

6.      Arcadex Corporation ("Arcadex") was an unaffiliated shell company

incorporated in Belize. Arcadex was established and managed at the Division of Structured

Operations' direction and used by ODEBRECHT to further the bribery scheme, and to conceal

and disguise improper payments made to, and for the benefit of, foreign officials and foreign

political parties in various countries. Arcadex opened at least one offshore bank account (the

"Arcadex Account") on behalf of ODEBRECHT. ODEBRECHT transferred money from

various bank accounts, including the New York-based Accounts, to the Arcadex Account. The

funds in the Arcadex Account were then used, in part, to make direct and indirect bribe payments

to foreign officials.

7.      Golac Projects and Construction Corporation ("Golac") was an

unaffiliated shell company incorporated in the British Virgin Islands. Golac was established and

managed at the Division of Structured Operations' direction and used by ODEBRECHT to

further the bribery scheme, and to conceal and disguise corrupt payments made to, and for the

benefit of, foreign officials and foreign political parties in various countries. Golac opened at

least one offshore bank account (the "Golac Account") on behalf of ODEBRECHT.

ODEBRECHT transferred money from various bank accounts, including the New York-based

Accounts, to the Golac Account. The funds in the Golac Account were then used, in part, to make direct and indirect bribe payments to foreign officials.

8.     "Odebrecht Employee 1," a citizen of Brazil whose identity is known to the United States and ODEBRECHT, was an officer and senior executive of ODEBRECHT S.A. in or about and between January 2009 and December 2015 and an officer and senior executive of CNO in or about and between January 2002 and January 2010. Odebrecht Employee 1 was also a director of Braskem in or about and between 2009 and December 2015.

9.     "Odebrecht Employee 2," a citizen of Brazil whose identity is known to the United States and ODEBRECHT, was a senior executive in the Division of Structured Operations, in or about and between 2006 and 2015, and reported directly to Odebrecht Employee 1. Odebrecht Employee 2 operated the Division of Structured Operations to account for and disburse payments that were not included in ODEBRECHT's publicly-declared financials, including corrupt payments made to, or for the benefit of, foreign officials and foreign political parties in order to obtain and retain business for ODEBRECHT.

10.     "Odebrecht Employee 3," a citizen of Brazil whose identity is known to the United States and ODEBRECHT, was an executive of the Division of Structured Operations from approximately 2006 to 2015. Odebrecht Employee 3 reported to Odebrecht Employee 2 and was responsible for overseeing corrupt payments made in Brazil and abroad. In or about 2014 and 2015, while located in Miami, Florida, Odebrecht Employee 3 engaged in criminal conduct in furtherance of the scheme, including meetings with other co-conspirators to plan actions to be taken in connection with the Division of Structured Operations and the movement of criminal proceeds.

4

11.     "Odebrecht Employee 4," a citizen of Brazil whose identity is known to the United States and ODEBRECHT, was the Division of Structured Operations executive in charge of financial operations for complex and large payments made by the Division of Structured Operations outside of Brazil from approximately 2006 to 2015.  Odebrecht Employee 4 also helped Odebrecht Employee 3 oversee the corrupt payments made by the Division of Structured Operations in Brazil.  In or about 2014 and 2015, while located in Miami, Florida, Odebrecht Employee 4 engaged in conduct in furtherance of the scheme, including meetings with other co-conspirators to plan actions to be taken in connection with the Division of Structured Operations and the movement of criminal proceeds.

12.     "Odebrecht Employee 5," a citizen of Brazil whose identity is known to the United States and ODEBRECHT, was a high-level executive of CNO from approximately 1997 to 2007.  Thereafter, from approximately 2008 to 2010, Odebrecht Employee 5 held an officer position at CNO in the industrial works area, and in or about 2011 Odebrecht Employee 5 became a Corporate Leader within CNO.  He remained in that position until approximately 2015. As the primary contact between ODEBRECHT and Petrobras between approximately 2004 and 2012, Odebrecht Employee 5 oversaw the negotiation and payment of bribes by ODEBRECHT to Petrobras officials to obtain and retain business with Petrobras.

13.     "Odebrecht Employee 6," a citizen of Brazil whose identity is known to the United States and ODEBRECHT, was a high-level executive of the international area of the engineering division of ODEBRECHT from approximately 2008 to 2015.  Odebrecht Employee 6 reported to Odebrecht Employee 1 and was responsible for overseeing ODEBRECHT's Superintendent Directors, or country leaders, of Angola and several Latin

American countries.  As part of that supervision, Odebrecht Employee 6 approved many of the corrupt payments to foreign officials and foreign political parties outside of Brazil.

14.     Petrobras was a Brazilian state-controlled oil company, and a minority shareholder in Braskem.  Petrobras was headquartered in Rio de Janeiro, Brazil, and operated to refine, produce and distribute oil, oil products, gas, biofuels and energy.  The Brazilian government directly owned approximately 50.3% of Petrobras's common shares with voting rights, while an additional 10% of the corporation's shares were controlled by the Brazilian Development Bank and Brazil's Sovereign Wealth Fund.  Petrobras was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-3(f)(2)(A).

15.     "Brazilian Official 1," an individual whose identity is known to the United States and ODEBRECHT, was an executive and director at Petrobras.  Brazilian Official 1 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

16.     "Brazilian Official 2," an individual whose identity is known to the United States and ODEBRECHT, was an executive and director at Petrobras.  Brazilian Official 2 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

17.     "Brazilian Official 3," an individual whose identity is known to the United States and ODEBRECHT, was a manager at Petrobras.  Brazilian Official 3 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

6

18.     "Brazilian Official 4," an individual whose identity is known to the United States and ODEBRECHT, was a high-level state elected official in Brazil.  Brazilian Official 4 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

19.     "Brazilian Official 5," an individual whose identity is known to the United States and ODEBRECHT, was a high-level official in the legislative branch of government in Brazil.  Brazilian Official 5 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

III.    Overview of the Bribery Scheme

20.     In or about and between 2001 and 2016, ODEBRECHT, together with its co-conspirators, knowingly and willfully conspired and agreed with others to corruptly provide hundreds of millions of dollars in payments and other things of value to, and for the benefit of, foreign officials, foreign political parties, foreign political party officials and foreign political candidates to secure an improper advantage and to influence those foreign officials, foreign political parties and foreign political candidates in order to obtain and retain business in various countries around the world.

21.     During the relevant time period, ODEBRECHT, together with its co-conspirators, paid approximately $788 million in bribes in association with more than 100 projects in twelve countries, including Angola, Argentina, Brazil, Colombia, Dominican Republic, Ecuador, Guatemala, Mexico, Mozambique, Panama, Peru and Venezuela.

22.     To further the criminal bribery scheme, ODEBRECHT and its co-conspirators created and funded an elaborate, secret financial structure that operated to account

7

for and disburse corrupt bribe payments to, and for the benefit of, foreign officials, foreign political parties, foreign political party officials and foreign political candidates. Over time, the development and operation of this secret financial structure evolved, and in or about 2006, ODEBRECHT established the Division of Structured Operations, a standalone division within ODEBRECHT. The Division of Structured Operations effectively functioned as a bribe department within ODEBRECHT and its related entities. To conceal its activities, the Division of Structured Operations utilized an entirely separate and off-book communications system called "Drousys," which allowed members of the Division of Structured Operations to communicate with one another and with outside financial operators and other co-conspirators about the bribes through the use of secure emails and instant messages, utilizing codenames and passwords.

23. ODEBRECHT and its employees and agents took a number of steps while in the territory of the United States in furtherance of the corrupt scheme. For example, some of the offshore entities used by the Division of Structured Operations to hold and disburse unrecorded funds were established, owned and/or operated by individuals located in the United States. In addition, at times during the conspiracy, individuals working in the Division of Structured Operations, including Odebrecht Employee 3, Odebrecht Employee 4 and others, took steps in furtherance of the bribery scheme while located in the United States. For example, in or about 2014 and 2015, while located in Miami, Florida, Odebrecht Employee 3 and Odebrecht Employee 4 engaged in conduct related to certain projects in furtherance of the scheme, including meetings with other co-conspirators to plan actions to be taken in connection with the

Division of Structured Operations, the movement of criminal proceeds and other criminal conduct.

24.     In all, ODEBRECHT, together with its co-conspirators, paid more than $788 million in bribes to illegally secure projects in multiple countries – including, as described below, corrupt payments to Petrobras employees and executives; corrupt payments to other government officials in Brazil; and corrupt payments to foreign officials in eleven other countries – with ill-gotten benefits to ODEBRECHT and its co-conspirators of approximately $3.336 billion.  In this Information, "benefits" refer to any profits earned on a particular project for which a profit was generated as the result of a bribe payment.  For projects that resulted in profits to ODEBRECHT that were less than the amount of the associated bribe payment, the amount of the bribe payment was used to calculate the benefit.

IV.     The Division of Structured Operations and The Manner and Means of the Conspiracy

25.     The Division of Structured Operations was led by Odebrecht Employee 2 and staffed by other ODEBRECHT employees and/or agents (including Odebrecht Employee 3 and Odebrecht Employee 4) who worked with a series of financial operators or *doleiros* (also known as money traders, who functioned to exchange Brazilian Reais for American dollars). Odebrecht Employee 2 reported to Odebrecht Employee 1, who was responsible for approving corrupt payments made by the Division of Structured Operations until approximately 2009, and who, thereafter, received updates of the payments made by the Division of Structured Operations.  After approximately 2009, Odebrecht Employee 1 delegated the responsibility for approving the corrupt payments to the business leaders in Brazil and the various country leaders in the other jurisdictions.

26.     The Division of Structured Operations managed its "shadow" budget via two computer systems: (i) the "MyWebDay" system, which was used for making payment requests, processing payments, and generating and populating spreadsheets that tracked and internally accounted for the shadow budget; and (ii) the "Drousys" system, which allowed members of the Division of Structured Operations to communicate with one another and with outside financial operators and other co-conspirators using secure emails and instant messages. To conceal their corrupt activities, users of the Drousys system utilized a series of codenames to mask their identities, and referred to bribe recipients and intermediaries using additional codes and passwords.

27.     To further conceal ODEBRECHT's criminal conduct, the Division of Structured Operations managed and distributed funds that ODEBRECHT never recorded on its balance sheet. These "unrecorded funds" were generated by ODEBRECHT through a variety of methods, including but not limited to: (i) standing overhead charges collected from subsidiaries; (ii) overcharges and fees that were attributed as legitimate to service providers and subcontractors but not included in project budgets; (iii) undeclared retainers and success fees for the purchase of company assets; and (iv) self-insurance and self-guarantee transactions.

28.     Once generated, unrecorded funds were funneled by the Division of Structured Operations to a series of offshore entities that were not included on ODEBRECHT's balance sheet as related entities. These entities were established and managed at the Division of Structured Operations' direction by beneficial owners who were compensated for opening and, in some cases, operating these entities. ODEBRECHT used these offshore entities to further the bribery scheme, and to conceal and disguise improper payments made to, or for the benefit of,

10

foreign officials, foreign political parties, foreign political party officials and foreign political candidates in various countries. Many of the transactions were layered through multiple levels of offshore entities and bank accounts throughout the world, often transferring the illicit funds through up to four levels of offshore bank accounts before reaching the final recipient. In this regard, members of the conspiracy sought to distance the origin of the funds from the final beneficiaries.

29.     The funds were disbursed from the offshore entities at the Division of Structured Operations' direction. These disbursements were made by financial operators who acted on ODEBRECHT's behalf, including but not limited to the beneficial owners of the accounts and *doleiros,* who delivered the payments in cash both inside and outside Brazil in packages or suitcases at locations predetermined by the beneficiary of the funds; or made the payments via wire transfer through one or more of the offshore entities.

30.     In furtherance of the bribery scheme and to facilitate the movement of illicit funds, ODEBRECHT and its co-conspirators also utilized banks with distinct features that would aid in the scheme: specifically, smaller banks located in countries with strict laws regarding the protection of bank secrecy and the sharing of information with international law enforcement. To ensure the cooperation of these favored banks, ODEBRECHT and its co-conspirators frequently paid remuneration fees and higher rates to the banking institutions, and a percentage of each illicit transaction to certain complicit bank executives. The Division of Structured Operations counted on the collusion of the favored banks and their executives to conduct the transfers between accounts, largely relying on the use of fictitious contracts to backstop the transactions and bypass compliance inquiries. Certain co-conspirators, such as

11

Odebrecht Employee 4, visited the countries where the final beneficiaries were located and brought them to the favored banks to open accounts to facilitate the illicit payment transfers.

31.     After a particular favored bank located in Antigua began to falter, members of the conspiracy, including former executives with the faltering bank, purchased the Antiguan branch of an Austrian bank in or about 2010 or 2011.  By virtue of this acquisition, other members of the conspiracy, including senior politicians from multiple countries receiving bribe payments, could open bank accounts and receive transfers without the risk of raising attention.  By acquiring the bank, members of the conspiracy, including Odebrecht Employee 4 and others, willfully facilitated the illegal payment scheme.  They also actively participated in obtaining fictitious contracts to support the operations of the Division of Structured Operations and responded directly to compliance issues in order to allow operations to be authorized.

32.     ODEBRECHT caused wire transfers to be made to these and other bank accounts created by these offshore entities from ODEBRECHT-related bank accounts, including from several New York-based Accounts held by CNO.

V.     Corrupt Payments to Government Officials in Brazil

33.     Beginning in at least as early as 2003 and continuing through approximately 2016, ODEBRECHT caused approximately $349 million in corrupt bribe payments to be made to political parties, foreign officials, and their representatives, in Brazil, in order to secure an improper advantage to obtain and retain business for ODEBRECHT. ODEBRECHT benefited more than $1.9 billion as a result of these corrupt payments.

12

A.    <u>Corrupt Payments to Obtain and Retain Business with Petrobras</u>

34.    Beginning in or about 2004 and continuing through at least 2012, ODEBRECHT agreed to make, and caused to be made, corrupt payments to, and for the benefit of, foreign officials, including Brazilian politicians and Petrobras executives and employees, in order to secure contracts with Petrobras.

35.    As part of the scheme, ODEBRECHT participated in a series of meetings with other construction companies to evaluate and divide up future contracts for Petrobras projects among the companies (together, the "Cartel Companies").  Once it was determined which company or companies should be responsible for a certain project, as well as the price that Petrobras felt was appropriate for the particular project, it was agreed that only the predetermined company would present a qualifying bid, and that the other Cartel Companies would present proposals that would ensure the predetermined company's winning bid.  In this manner, the Cartel Companies rotated the available Petrobras contracts between them.

36.    Certain executives of Petrobras involved in awarding the projects on behalf of Petrobras were aware of the Cartel Companies' bid rigging, and in order to guarantee the continued success of the bid rigging scheme and to secure the contracts with Petrobras, ODEBRECHT and the other Cartel Companies agreed to make corrupt payments to, and for the benefit of, these Petrobras executives, other Brazilian politicians and political parties.

37.    For example, in or about October 2010, ODEBRECHT bid for and won a Petrobras contract for the provision of various environmental and security certification services that were necessary for various activities that Petrobras undertook abroad.  In order to win the contract, ODEBRECHT agreed to pay bribes that would be forwarded to Brazilian political

parties. Odebrecht Employee 5 met with certain of the Cartel Companies, all of which agreed that ODEBRECHT would get the contract; two of the Cartel Companies also agreed to provide proposals in such a way that would ensure that ODEBRECHT would win the bid. ODEBRECHT directed more than $40 million to certain Brazilian political parties from its Division of Structured Operations using unrecorded funds in connection with the project; and certain of the funds were paid directly to specific government officials.

38.     ODEBRECHT caused numerous illicit payments to be made from United States-based bank accounts to perpetuate its bribe scheme in Brazil. For example, between at least December 2006 and December 2007, ODEBRECHT caused transfers totaling almost $40 million to be made from the New York-based Accounts to the S&N Account. Thereafter, in or between January and August 2011, ODEBRECHT used the S&N Account to make bribe payments, including paying approximately $3.5 million and almost 2 million Swiss Francs to the bank account of an offshore entity controlled by Brazilian Official 1, then an executive at Petrobras.

39.     Similarly, in or about December 2009, ODEBRECHT caused transfers totaling approximately $20 million to be made from the New York-based Accounts to the Arcadex Account. Before and contemporaneously with the transfers from the New York-based Accounts, ODEBRECHT caused numerous money transfers to be made from the Arcadex Account to a second Arcadex account (the "Second Arcadex Account") that was used to make bribe payments, including an approximately $430,000 bribe payment to a bank account controlled by Brazilian Official 2, then an executive at Petrobras.

40.    Furthermore, in or about December 2008, ODEBRECHT caused transfers totaling almost $48 million to be made from the New York-based Accounts to the Golac Account.  Thereafter, in or about and between December 2008 and July 2010, ODEBRECHT caused transfers from the Golac Account to three unrelated accounts in Panama and Antigua from which approximately $10 million was transferred to the accounts of three then-Petrobras executives Brazilian Official 1, Brazilian Official 2 and Brazilian Official 3.

B.    Corrupt Payments to Obtain and Retain Other Business in Brazil

41.    In addition to the corrupt payments to secure contracts with Petrobras, ODEBRECHT made and caused to be made corrupt payments to political parties, individual candidates and other government officials at the local, regional and national level in Brazil with unrecorded funds from the Division of Structured Operations in order to obtain and retain other business in Brazil.

42.    For example, ODEBRECHT made and caused to be made corrupt payments to Brazilian officials with unrecorded funds in order to secure a transportation project in Brazil.  ODEBRECHT was not part of the original group of companies awarded the project, but ultimately purchased the rights to participate in the project.  Subsequently, ODEBRECHT agreed to make payments to Brazilian Official 4, a high-level state elected official in Brazil, in exchange for Brazilian Official 4's assistance in ensuring ODEBRECHT's continued work on the project.  Between approximately 2010 and 2014, ODEBRECHT, through the Division of Structured Operations, made payments in Brazilian Reais (totaling more than $20 million) to Brazilian Official 4 and other foreign officials in connection with the project.  ODEBRECHT profited approximately $184 million from the project.

15

43.     Similarly, in or about 2011, Brazilian Official 5, a high-level official within the legislative branch of government in Brazil, requested that ODEBRECHT make payments to a political party in exchange for the party's influence to continue a construction project in Rio de Janeiro from which ODEBRECHT stood to benefit.  In or about and between 2011 and 2014, ODEBRECHT, through the Division of Structured Operations, made payments in Brazilian Reais (totaling approximately $9.7 million) to Brazilian Official 5, as did other companies involved in the project, in order to ensure future contributions to the project from certain government groups.  ODEBRECHT profited approximately $142 million from the project.

VI.     Corrupt Payments to Foreign Officials and Political Parties in Other Countries

44.     In or about and between 2001 and 2016, ODEBRECHT made and caused to be made approximately $439 million in corrupt payments to foreign political parties, foreign officials, and their representatives, in countries outside of Brazil, including Angola, Argentina, Colombia, the Dominican Republic, Ecuador, Guatemala, Mexico, Mozambique, Panama, Peru and Venezuela, in order to secure an improper advantage to obtain and retain business for ODEBRECHT in those countries.  ODEBRECHT benefited more than $1.4 billion as a result of these corrupt payments.

45.     ODEBRECHT made and caused to be made the majority of these corrupt payments to government officials; third parties associated with, and for the benefit of, government officials; and political parties or campaigns.  All of the corrupt payments were made to secure an improper advantage for ODEBRECHT to obtain and retain business.  Typically, the Division of Structured Operations executed the corrupt payments using unrecorded funds, either

16

(i) in cash in the country in question, or (ii) by deposits into accounts indicated by the ultimate beneficiaries or their intermediaries.

46.     In or about and between 2008 and 2015, ODEBRECHT's corporate structure in Latin America was organized such that the senior-most country leaders reported to Odebrecht Employee 6, who was the Business Leader for Angola (until July 2012, at which time, due to a restructuring, Odebrecht Employee 6 no longer had oversight in Angola) and the above-referenced countries in Latin America, except Venezuela.

A.     Angola

47.     In or about and between 2006 and 2013, ODEBRECHT made and caused to be made more than $50 million in corrupt payments to government officials in Angola in order to secure public works contracts.  ODEBRECHT realized benefits of approximately $261.7 million as a result of these corrupt payments.

48.     For example, beginning in or about 2006, Odebrecht Employee 6 caused ODEBRECHT to make approximately $8 million in corrupt payments to an Angolan government official to obtain infrastructure projects in Angola.  ODEBRECHT also paid another approximately $1.19 million to a high-level official of an Angolan state-owned and state-controlled company to obtain business.  The bribe payments were generally made with unrecorded funds and coordinated through the Division of Structured Operations.

B.     Argentina

49.     In or about and between 2007 and 2014, ODEBRECHT made and caused to be made more than $35 million in corrupt payments to intermediaries with the understanding that these payments would be passed, in part, to government officials in Argentina.  The corrupt

17

payments were made in association with at least three infrastructure projects, and ODEBRECHT realized benefits of approximately $278 million.

50.     For example, in 2008, prior to a bid on government projects being finalized, ODEBRECHT agreed that, in order to secure the contracts, ODEBRECHT and others would commit to making a future payment to undisclosed government officials in Argentina in an unspecified amount.  In or about and between 2011 and 2014, ODEBRECHT, through the Division of Structured Operations, made payments totaling approximately $2.9 million to an intermediary with the understanding that the intermediary would pass the payments to Argentinian government officials.

51.     Thereafter, in or about and between January 2011 and March 2014, ODEBRECHT made additional corrupt payments through the Division of Structured Operations totaling approximately $500,000 to private accounts at the direction of an intermediary, with the understanding that the payments were for the benefit of Argentinian government officials.

C.     Colombia

52.     In or about and between 2009 and 2014, ODEBRECHT made and caused to be made more than $11 million in corrupt payments in Colombia in order to secure public works contracts.  ODEBRECHT realized benefits of more than $50 million as a result of these corrupt payments.

53.     For example, in or about and between 2009 and 2010, ODEBRECHT agreed to pay, and later paid through the Division of Structured Operations with Odebrecht Employee 6's authorization, a $6.5 million bribe to a government official in charge of awarding

a construction project with the Colombian government in exchange for assistance with winning the project.

      D.      <u>The Dominican Republic</u>

      54.      In or about and between 2001 and 2014, ODEBRECHT made and caused to be made more than $92 million in corrupt payments to government officials and intermediaries working on their behalf in the Dominican Republic.  ODEBRECHT realized benefits of more than $163 million as a result of these corrupt payments.

      55.      For example, in order to secure certain public works contracts in the Dominican Republic, ODEBRECHT paid bribes to an intermediary responsible for interfacing with the government with the understanding that the intermediary would pass the money, in part, to government officials.  Most of the payments were made with unrecorded funds from the Division of Structured Operations with the authorization of Odebrecht Employee 6.  Through this agreement, ODEBRECHT was able to influence governmental budget and financing approvals for certain projects in the Dominican Republic.

      E.      <u>Ecuador</u>

      56.      In or about and between 2007 and 2016, ODEBRECHT made and caused to be made more than $33.5 million in corrupt payments to government officials in Ecuador.  ODEBRECHT realized benefits of more than $116 million as a result of these corrupt payments.

      57.      For example, in or about and between 2007 and 2008, ODEBRECHT experienced a number of problems related to a construction contract, and agreed with an intermediary to an Ecuadorian government official with control over public contracts to make

corrupt payments to the government official to solve the problems.  ODEBRECHT later delivered these payments in cash to the government official.

      F.    <u>Guatemala</u>

      58.    In or about and between 2013 and 2015, ODEBRECHT made and caused to be made approximately $18 million in corrupt payments to government officials in Guatemala in order to secure public works contracts.  ODEBRECHT realized benefits of more than $34 million as a result of these corrupt payments.

      59.    For example, in relation to an infrastructure project awarded to ODEBRECHT, the company agreed to pay a high-ranking Guatemalan government official a percentage of the value of the contract over the life of the project in exchange for the official assisting ODEBRECHT with obtaining payments under the contract.  ODEBRECHT made approximately $11.5 million in corrupt payments, through the Division of Structured Operations and with Odebrecht Employee 6's approval, to companies designated by the Guatemalan official.

      G.    <u>Mexico</u>

      60.    In or about and between 2010 and 2014, ODEBRECHT made and caused to be made approximately $10.5 million in corrupt payments to government officials in Mexico in order to secure public works contracts.  ODEBRECHT realized benefits of more than $39 million as a result of these corrupt payments.

      61.    For example, in or about October 2013, ODEBRECHT agreed to pay a bribe to a high-level official of a Mexican state-owned and state-controlled company in exchange for the official assisting ODEBRECHT with winning a project.  In or about and between

December 2013 and late 2014, ODEBRECHT, through the Division of Structured Operations, paid the official $6 million.

H.    Mozambique

62.    In or about and between 2011 and 2014, ODEBRECHT made and caused to be made approximately $900,000 in corrupt payments to government officials in Mozambique.

63.    The corrupt payments included approximately $250,000 in payments to a high-level government official in Mozambique in exchange for ODEBRECHT obtaining favorable terms on a government construction project, which the government had not been inclined to accept before ODEBRECHT offered to make the corrupt payment.  ODEBRECHT made these payments in installments of $135,000 and $115,000 with the Division of Structured Operations' unrecorded funds from an offshore company.

I.    Panama

64.    In or about and between 2010 and 2014, ODEBRECHT made and caused to be made more than $59 million in corrupt payments to government officials and intermediaries working on their behalf in Panama in order to secure, among other things, public works contracts.  ODEBRECHT realized benefits of more than $175 million as a result of these corrupt payments.

65.    For example, in or about and between 2009 and 2012, ODEBRECHT agreed to pay $6 million to two close relatives of a high-level Panamanian government official in connection with government infrastructure projects, with the understanding that, in exchange for the payments, the government official would ensure ODEBRECHT's participation in and

payment under the contracts.  In order to effectuate the corrupt payments, ODEBRECHT utilized the Division of Structured Operations to make payments in unrecorded funds to offshore companies designated by the Panamanian government official and intermediaries.

      J.    <u>Peru</u>

      66.    In or about and between 2005 and 2014, ODEBRECHT made and caused to be made approximately $29 million in corrupt payments to government officials in Peru in order to secure public works contracts.  ODEBRECHT realized benefits of more than $143 million as a result of these corrupt payments.

      67.    For example, in or about 2005, ODEBRECHT participated in a tender for a government infrastructure project.  During the tender process, an ODEBRECHT employee was approached by an intermediary of a high-level official in the Peruvian government, who offered to support ODEBRECHT's bid, if, in the event that ODEBRECHT was awarded the project, it would make corrupt payments benefiting the government official.  The payments were agreed to be paid through companies owned by an intermediary who had a relationship with the government official.  After the initial conversations with the intermediary, the ODEBRECHT employee participated in several meetings, some of which were attended by the government official.  ODEBRECHT won the tender and made corrupt payments totaling approximately $20 million from approximately 2005 to 2008 to specific companies, as directed by the intermediary, with unrecorded funds from the Division of Structured Operations.

      68.    Furthermore, in or about 2008, ODEBRECHT bid on a government transportation contract in Peru.  In order to influence the bid committee to help ODEBRECHT secure the contract, ODEBRECHT agreed to pay $1.4 million to a high-level official in the

Peruvian government and members of the tender committee for the project.  In or about 2009, ODEBRECHT won the contract, valued at approximately $400 million.  ODEBRECHT made the corrupt payments, which were approved by Odebrecht Employee 6, with unrecorded funds from the Division of Structured Operations.

K.    Venezuela

69.    In or about and between 2006 and 2015, ODEBRECHT made and caused to be made approximately $98 million in corrupt payments to government officials and intermediaries working on their behalf in Venezuela in order to obtain and retain public works contracts.

70.    ODEBRECHT typically used intermediaries to negotiate contracts with government officials on behalf of the company.  ODEBRECHT understood that these intermediaries would pay bribes to government officials on behalf of the company in order to influence the allocation of resources to ODEBRECHT projects, to obtain confidential pricing and bidding information in connection with those projects, and to obtain and retain contracts for those projects.  Generally, these intermediaries charged a percentage of the contract price in connection with their work on behalf of ODEBRECHT.

71.    For example, ODEBRECHT paid an intermediary to help it obtain contracts with a Venezuelan state-owned and state-controlled company.  During the negotiations, the intermediary made it clear that the money would be used to pay a bribe in exchange for obtaining certain service agreements and amendments, and that the intermediary represented various directors of the state-owned and state-controlled company.  ODEBRECHT paid the intermediary approximately $39 million.

23

VII.   Obstruction of Justice

72.     In or about 2014, Brazilian law enforcement authorities began an initially covert investigation into corruption related to Petrobras, called Lavo Jato or "Operation Carwash." Thereafter, related investigations were launched in the United States and Switzerland. After ODEBRECHT became aware of Lavo Jato and related investigations, certain individuals – including Odebrecht Employee 1 and employees and executives involved in the Division of Structured Operations – took steps to conceal or destroy evidence of criminal activities, and to hinder the various investigations. These steps included, but were not limited to, a directive from Odebrecht Employee 1 to ODEBRECHT employees to delete records that might reveal illegal activities.

73.     Furthermore, in or about mid-2015, Odebrecht Employee 4 attended a meeting in Miami, Florida, with a consular official from Antigua and an intermediary to a high-level government official in Antigua. In order to conceal ODEBRECHT's corrupt activities, Odebrecht Employee 4 requested that the high-level official refrain from providing to international authorities various banking documents that would reveal illicit payments made by the Division of Structured Operations on behalf of ODEBRECHT, and agreed to pay $4 million to the high-level official to refrain from sending the documents. Odebrecht Employee 3 made three payments of 1 million Euros on behalf of ODEBRECHT in order to secure the deal. The contemplated fourth payment was never made.

74.     Furthermore, in or about January 2016, after Lavo Jato and the investigations by United States and Swiss authorities were well-known to ODEBRECHT, employees and/or agents of ODEBRECHT intentionally caused the destruction of physical

24

encryption keys needed to access the MyWebDay system, which contained evidence relating to the bribery scheme.  As a result of these actions, significant evidence from the MyWebDay system was rendered inaccessible.

<u>CONSPIRACY TO BRIBE FOREIGN OFFICIALS</u>

     75.     The allegations contained in paragraphs one through 74 are realleged and incorporated as though fully set forth in this paragraph.

     76.     In or about and between 2001 and 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ODEBRECHT S.A., together with others, did knowingly and willfully conspire to commit offenses against the United States, to wit: as a person other than an issuer or domestic concern, through its employees and agents, while in the territory of the United States, did corruptly commit acts in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, a foreign political party, a foreign political party official, a foreign political candidate and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, a foreign political party, a foreign political party official and a foreign political candidate for purposes of: (a) influencing acts and decisions of such foreign official, foreign political party, foreign political party official and foreign political candidate in his or her official capacity; (b) inducing such foreign official, foreign political party, foreign political party official and foreign political candidate to do and omit to do acts in violation of the lawful duty of such official; (c) securing any improper advantage; and (d) inducing such foreign official, foreign political party, foreign political party

25

official and foreign political candidate to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist ODEBRECHT S.A. and its employees and agents in obtaining and retaining business for and with, and directing business to ODEBRECHT S.A. and others, contrary to Title 15, United States Code, Section 78dd-3.

77.     In furtherance of the conspiracy and to effect its objects, the defendant ODEBRECHT S.A. and at least one of the defendant's co-conspirators committed and caused to be committed, within the Eastern District of New York and elsewhere, at least one of the following:

<div align="center">OVERT ACTS</div>

a.     In or about 2006, ODEBRECHT S.A., at the direction of Odebrecht Employee 1, established a secret financial structure that was used by ODEBRECHT S.A. and its subsidiaries, in part, to pay bribes to foreign officials, foreign political parties and foreign political candidates, as well as intermediaries on behalf of ODEBRECHT S.A. and several of its subsidiaries.

b.     On or about December 22, 2006, ODEBRECHT S.A. caused $10,935,066.85 to be transferred from one of the New York Accounts to the S&N Account.

c.     On or about December 12, 2007, ODEBRECHT S.A. caused two payments of $1,271,964.00 each, totaling $2,543,928.00, to be transferred from one of the New York Accounts to the S&N Account.

    d.    On or about December 12, 2007, ODEBRECHT S.A. caused two payments of $1,898,963.00 each, totaling $3,797,962.00, to be transferred from one of the New York Accounts to the S&N Account.

    e.    On or about December 16, 2009, ODEBRECHT S.A. caused $6,583,828.14 to be transferred from one of the New York Accounts to the Arcadex Account.

    f.    On or about December 24, 2009, ODEBRECHT S.A. caused $6,583,828.14 to be transferred from one of the New York Accounts to the Arcadex Account.

    g.    On or about December 24, 2009, ODEBRECHT S.A. caused two transfers of $329,191.42 each, totaling $658,382.84, to be made from the Arcadex Account to the Second Arcadex Account.

    h.    On or about March 25, 2010, ODEBRECHT S.A. caused $434,980.00 to be transferred from the Second Arcadex Account to a bank account controlled by Brazilian Official 2, then an executive at Petrobras.

    i.    In or about October 2010, ODEBRECHT S.A. directed more than $40 million in bribes to be paid to certain Brazilian political parties from its Division of Structured Operations in order to secure a contract for the provision of various environmental and security certification services for Petrobras abroad.

    j.    In or about and between 2010 and 2014, ODEBRECHT S.A. directed bribe payments of more than $20 million to be made to Brazilian Official 4, a high-level state elected official in Brazil, and other foreign officials, in order to ensure continued work on a transportation project.

k.      In or about 2011, ODEBRECHT S.A. directed bribe payments of approximately $9.7 million to be made to a political party designed by Brazilian Official 5, a high-level official within the legislative branch of government in Brazil, in exchange for the party's influence in the continuation of a construction project in Rio de Janeiro, Brazil.

l.      On or about May 23, 2011, ODEBRECHT S.A. caused $1,000,000.00 to be transferred from the S&N Account to a bank account controlled by Brazilian Official 1, then an executive at Petrobras.

m.      On or about June 6, 2011, ODEBRECHT S.A. caused $1,012,500.00 to be transferred from the S&N Account to a bank account controlled by Brazilian Official 1.

n.      In or about and between December 2013 and late 2014, ODEBRECHT S.A. directed bribe payments of approximately $6 million to be made to a high-level official of a Mexican state-owned and state-controlled company in exchange for the official assisting ODEBRECHT with winning a project.

o.      In or about 2015, Odebrecht Employee 4 attended a meeting in Miami, Florida with the agent of a high-level government official in Antigua, and agreed to pay $4 million to the government official, if the government official refrained from providing banking

28

records revealing illicit payments made by the Division of Structured Operations to international authorities.

(Title 18, United States Code, Sections 371 and 3551 et seq.)


ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK


ANDREW WEISSMANN
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

29