WMP/DK:JN/AS
F. #2016R00709

ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**COURT EXHIBIT**

$CR \ 16 - 643$

UNITED STATES OF AMERICA                    PLEA AGREEMENT

    - against –                                  Cr. No. <u>16-643 (RJD)</u>

ODEBRECHT S.A.,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

     The United States of America, by and through the Department of Justice, Criminal

Division, Fraud Section (the "Fraud Section"), and the United States Attorney's Office for the

Eastern District of New York (the "EDNY"), and Odebrecht S.A. (the "Defendant"), by and

through its undersigned attorneys, and through its authorized representative, pursuant to

authority described herein, hereby submit and enter into this plea agreement (the "Agreement"),

pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The terms and

conditions of this Agreement are as follows:

<u>TERM OF THE DEFENDANT'S OBLIGATIONS UNDER THE AGREEMENT</u>

     1.    Except as otherwise provided in Paragraph 11 below in connection with the

Defendant's cooperation obligations, the Defendant's obligations under the Agreement shall last

and be effective for a period beginning on the date on which the Information is filed and ending

three years from the later of the date on which the Information is filed or the date on which the

independent compliance monitor (the "Monitor") is retained by the Defendant, as described in

Paragraphs 30 to 32 below (the "Term"). The Defendant agrees, however, that, in the event the

Fraud Section and EDNY determine, in their sole discretion, that the Defendant has failed

specifically to perform or to fulfill completely each of the Defendant's obligations under this

Agreement, an extension or extensions of the Term may be imposed by the Fraud Section and EDNY, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Fraud Section and EDNY's right to proceed as provided in Paragraphs 30 to 32 below. Any extension of the Term extends all terms of this Agreement, including the terms of the monitorship in Attachment D, for an equivalent period. Conversely, in the event the Fraud Section and EDNY find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the monitorship in Attachment D, and that the other provisions of this Agreement have been satisfied, the Term may be terminated early, except for the Defendant's cooperation obligations described in Paragraph 11 below.

<u>RELEVANT CONSIDERATIONS</u>

2.      The Fraud Section and EDNY enter into this Agreement based on the individual facts and circumstances presented by this case, including:

a.      the Defendant did not voluntarily disclose to the Fraud Section and EDNY the conduct described in the Statement of Facts, attached hereto as Attachment B (the "Statement of Facts");

b.      the Defendant received full cooperation credit for its cooperation with the Fraud Section and EDNY's investigation by, among other things, (i) gathering evidence and performing forensic data collections in multiple jurisdictions; (ii) producing documents, including translations, to the Fraud Section and EDNY from foreign countries in ways that did not implicate foreign data privacy laws; (iii) collecting, analyzing, organizing, and producing voluminous evidence and information; (iv) providing non-privileged facts relating to projects obtained or retained through bribery; (v) providing non-privileged facts relating to individuals and companies involved in various illegal schemes; and (vi) facilitating and encouraging the

2

cooperation and voluntary disclosure of information and documents by current and former company personnel;

   c. the Defendant engaged in extensive remedial measures, including (i) terminating the employment of 51 individuals who participated in the misconduct described in the Statement of Facts, (ii) disciplining an additional 26 individuals who were engaged in the misconduct, including suspensions of up to a year and a half, significant financial penalties, and demotion to non-managerial, non-supervisory, non-decision making roles, for each of the 26 individuals, (iii) requiring individualized anti-corruption compliance and business ethics training for each of the 26 individuals, and requiring each to be subject to heightened oversight and day-to-day supervision, including ensuring that the independent compliance monitor described in Attachment D has full access and authority to evaluate the business activities and ongoing compliance of those individuals, (iv) creating a Chief Compliance Officer position that reports directly to the Audit Committee of the Board of Directors, (v) adopting heightened controls and anti-corruption compliance protocols, including hospitality and gift approval procedures, (vi) incorporating adherence to compliance principles into employee performance evaluation and compensation, (vii) increasing the number of employees dedicated to compliance by 50 percent; and (viii) more than doubling the resources devoted to compliance in 2016 and more than tripling the budget for 2017;

   d. although the Defendant had inadequate anti-corruption controls and little or no anti-corruption compliance program during the period of the conduct described in the Statement of Facts, the Defendant has been enhancing and has committed to continue to enhance its anti-corruption compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement;

3

e.      because the Defendant has not yet fully implemented or tested its compliance program, the Defendant has agreed to the imposition of an independent compliance monitor to reduce the risk of recurrence of misconduct (as set forth in Paragraphs 30 to 32 below);

f.      the nature and seriousness of the offense including a scheme to pay hundreds of millions of dollars in bribes to a large number of high-level government officials for a 15 year span carried out by high-level executives and directors at the Company;

g.      the Defendant has no prior criminal history;

h.      the Defendant has agreed to continue to cooperate with the Fraud Section and EDNY in any ongoing investigation of the conduct of the Defendant and its officers, directors, employees, agents, business partners, and consultants relating to violations of the Foreign Corrupt Practices Act of 1977 ("FCPA"); and

i.      accordingly, after considering (a) through (h) above, the Defendant received an aggregate discount of 25 percent off of the bottom of the applicable U.S. Sentencing Guidelines fine range.

<u>THE DEFENDANT'S AGREEMENT</u>

3.      Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Defendant agrees to knowingly waive indictment and its right to challenge venue in the United States District Court for the Eastern District of New York, and to plead guilty to a one-count criminal Information charging the Defendant with conspiracy to commit offenses against the United States in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the FCPA, as amended, Title 15, United States Code, Sections 78dd-3 (the "Information"). The Defendant further agrees to persist in that plea through sentencing.

4

4.      The Defendant understands that, to be guilty of this offense, the following essential elements of the offense must be satisfied:

a.      An unlawful agreement between two or more individuals to violate the FCPA existed; specifically, as a person or entity, while in the territory of the United States, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the Defendant and its co-conspirators in obtaining and retaining business for and with, and directing business to, any person;

b.      The Defendant knowingly and willfully joined that conspiracy;

c.      One of the members of the conspiracy knowingly committed or caused to be committed, in the Eastern District of New York or elsewhere in the United States, at least one of the overt acts charged in the Information; and

d.      The overt acts were committed to further some objective of the conspiracy.

5.      The Defendant understands and agrees that this Agreement is between the Fraud Section, EDNY and the Defendant and does not bind any other division or section of the

5

Department of Justice or any other federal, state, local, or foreign prosecuting, administrative, or regulatory authority. Nevertheless, the Fraud Section and EDNY will bring this Agreement and the nature and quality of the conduct, cooperation and remediation of the Defendant, its direct or indirect affiliates, subsidiaries, and joint ventures, to the attention of other prosecuting authorities or other agencies, as well as debarment authorities and Multilateral Development Banks ("MDBs"), if requested by the Defendant. By agreeing to provide this information to such authorities, the Fraud Section and EDNY are not agreeing to advocate on behalf of the Defendant, but rather are agreeing to provide facts to be evaluated independently by such authorities.

6.      The Defendant agrees that this Agreement will be executed by an authorized corporate representative. The Defendant further agrees that, consistent with the process provided for in the Defendant's by-laws for authorizing action by a representative, a power of attorney duly enacted by the Defendant's officers, in the form attached to this Agreement as Attachment A ("Certificate of Corporate Resolutions"), authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's officers, on behalf of the Defendant.

7.      The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

8.      The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

        a.      to plead guilty as set forth in this Agreement;

        b.      to abide by all sentencing stipulations contained in this Agreement;

6

c.    to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

d.    to commit no further crimes;

e.    to be truthful at all times with the Court;

f.    to pay the applicable fine and special assessment;

g.    to cooperate fully with the Fraud Section and EDNY as described in Paragraph 11;

h.    to implement a compliance program as described in Paragraph 9 and Attachment C; and

i.    to retain an independent compliance monitor pursuant to Paragraphs 30 to 32 and Attachment D.

9.    The Defendant represents that it has implemented and will continue to implement a compliance and ethics program throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption, designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws. In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Defendant represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures regarding compliance with the FCPA and other applicable anti-corruption laws. Where necessary and appropriate, the Defendant will adopt new or modify existing internal controls, policies, and procedures in order to ensure that the Defendant maintains: (a) an effective system of internal accounting controls designed to

7

ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws. The compliance program, including the internal accounting controls system, will include, but not be limited to, the minimum elements set forth in Attachment C. The Fraud Section and EDNY, in their sole discretion, may consider the Monitor's certification decision in assessing the Defendant's compliance program.

10. Except as may otherwise be agreed by the parties in connection with a particular transaction, the Defendant agrees that in the event that, during the Term of the Agreement, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Defendant's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Fraud Section and EDNY's ability to declare a breach under this Agreement is applicable in full force to that entity. The Defendant agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Defendant shall provide notice to the Fraud Section and EDNY at least 30 days prior to undertaking any such sale, merger, transfer, or other change in corporate form. If the Fraud Section and EDNY notify the Defendant prior to such transaction (or series of transactions) that it has determined that the transaction(s) has the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of

8

the Fraud Section and EDNY, the Defendant agrees that such transaction(s) will not be consummated. In addition, if at any time during the Term of the Agreement the Fraud Section and EDNY determine in their sole discretion that the Defendant has engaged in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, it may deem it a breach of this Agreement pursuant to Paragraphs 24 to 27 of this Agreement. Nothing herein shall restrict the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section and EDNY.

11.     The Defendant shall cooperate fully with the Fraud Section and EDNY in any and all matters relating to the conduct described in this Agreement and the Statement of Facts, and any individual or entity referred to therein, as well as any and all matters relating to corrupt payments, false books and records, the failure to implement adequate internal accounting controls, investment adviser fraud, mail, wire, securities, or bank fraud, false statements to a bank, obstruction of justice, and money laundering, subject to applicable law and regulations, until the later of the date upon which all investigations, prosecutions and proceedings, including those involving Braskem S.A. ("Braskem"), an entity that is controlled by the Defendant, arising out of such conduct are concluded, or the end of the Term. At the request of the Fraud Section and EDNY, the Defendant shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the MDBs, in any investigation of the Defendant, its affiliates, including Braskem and its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to corrupt payments, false books and records, the failure to implement adequate

9

internal accounting controls, investment adviser fraud, mail, wire, securities, bank fraud, or false statements to a bank, obstruction of justice, and money laundering. The Defendant agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following, subject to local law and regulations, including relevant data privacy and national security laws and regulations:

      a.     The Defendant shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, those of its subsidiary companies and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Defendant has any knowledge or about which the Fraud Section and EDNY may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Fraud Section and EDNY, upon request, any document, record or other tangible evidence about which the Fraud Section and EDNY may inquire of the Defendant.

      b.     Upon request of the Fraud Section and EDNY, the Defendant shall designate knowledgeable employees, agents or attorneys to provide to the Fraud Section and EDNY the information and materials described in Paragraph 11(a) above on behalf of the Defendant. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

      c.     The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section and EDNY, present or former officers, directors, employees, agents and consultants of the Defendant. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this

10

Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

        d.      With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section and EDNY pursuant to this Agreement, the Defendant consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Fraud Section and EDNY, in their sole discretion, shall deem appropriate.

      12.     In addition to the obligations in Paragraph 11, during the Term, should the Defendant learn of any evidence or allegation of conduct that would be a possible violation of the FCPA anti-bribery or accounting provisions had the conduct occurred within the jurisdiction of the United States, the Defendant shall promptly report such evidence or allegation to the Fraud Section and EDNY. Thirty days prior to the end of the Term, the Defendant, by the Chief Executive Officer of the Defendant and the Chief Financial Officer of the Defendant, will certify to the Fraud Section and EDNY that the Defendant has met its disclosure obligations pursuant to this Paragraph. Each certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

      13.     The Defendant agrees that any fine imposed by the Court will be due and payable as specified in Paragraph 21 below, and that any restitution imposed by the Court will be due and payable in accordance with the Court's order. The Defendant further agrees to pay to the Clerk of the Court for the United States District Court for the Eastern District of New York the mandatory special assessment of $400 (pursuant to 18 U.S.C. § 3103(a)(2)(B)) within ten (10) business days from the date of sentencing.

## THE UNITED STATES' AGREEMENT

14.     In exchange for the guilty plea of the Defendant and the complete fulfillment of

all of its obligations under this Agreement, the Fraud Section and EDNY agree that they will not

file additional criminal charges against the Defendant or any of its direct or indirect subsidiaries

or joint ventures relating to any of the conduct described in the Information or the Statement of

Facts, except for the charges against Braskem S.A. specified in the Information and Plea

Agreement between the Fraud Section and EDNY and Braskem S.A. filed on December 21,

2016 ("Braskem Plea Agreement").  The Fraud Section and EDNY, however, may use any

information related to the conduct described in the Statement of Facts against the Defendant:  (a)

in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false

statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a

prosecution or other proceeding relating to a violation of any provision of Title 26 of the United

States Code.  This Agreement does not provide any protection against prosecution for any future

conduct by the Defendant or by any of its affiliates, subsidiaries, officers, directors, employees,

agents or consultants, whether or not disclosed by the Defendant pursuant to the terms of this

Agreement.  In addition, this Agreement does not provide any protection against prosecution of

any individuals, regardless of their affiliation with the Defendant.  The Defendant agrees that

nothing in this Agreement is intended to release the Defendant from any and all of the

Defendant's tax liabilities and reporting obligations for any and all income not properly reported

and/or legally or illegally obtained or derived.

## FACTUAL BASIS

15.     The Defendant is pleading guilty because it is guilty of the charges contained in

the Information.  The Defendant admits, agrees, and stipulates that the factual allegations set

forth in the Information and the Statement of Facts are true and correct, that it is responsible for

the acts of its affiliates, subsidiaries, officers, directors, employees, and agents described in the Information and the Statement of Facts, and that the Information and the Statement of Facts accurately reflect the Defendant's criminal conduct. The Defendant stipulates to the admissibility of the Statement of Facts in any proceeding by the Fraud Section and EDNY, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the attached Statement of Facts at any such proceeding.

### THE DEFENDANT'S WAIVER OF RIGHTS, INCLUDING THE RIGHT TO APPEAL

16.     Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn. The Defendant expressly warrants that it has discussed these rules with its counsel and understands them. Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410. Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Fraud Section and EDNY have fulfilled all of their obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

17.     The Defendant is satisfied that the Defendant's attorneys have rendered effective assistance. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as provided in this Agreement. The Defendant understands that the rights of criminal defendants include the following:

      a.     the right to plead not guilty and to persist in that plea;

      b.     the right to a jury trial;

      c.      the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings;

      d.      the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

      e.      pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

Nonetheless, the Defendant knowingly waives the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum described below (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the Fraud Section and EDNY in this plea agreement. This Agreement does not affect the rights or obligations of the Fraud Section and EDNY as set forth in Title 18, United States Code, Section 3742(b). The Defendant also knowingly waives the right to bring any collateral challenge challenging either the conviction, or the sentence imposed in this case. The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a. The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in the Information and the Statement of Facts including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c)

14

the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of the Agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Fraud Section and EDNY are free to take any position on appeal or any other post-judgment matter. The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

PENALTY

18.    The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371, is: a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 15, United States Code, Section 78ff(a) and Title 18, United States Code, Section 3571(c), (d); five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400 per count, Title 18, United States Code, Section 3013(a)(2)(B). In this case, the parties agree that the gross pecuniary gain resulting from the offense is $3.336 billion. Therefore, pursuant to 18 U.S.C. § 3571(d), the maximum fine that may be imposed is twice the gross gain, or $6.672 billion per offense.

SENTENCING RECOMMENDATION

19.    The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines. The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in Title 18,

15

United States Code, Section 3553(a).  The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof.  The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 18.

20.     The Fraud Section, EDNY and the Defendant agree that a faithful application of the United States Sentencing Guidelines (U.S.S.G.) to determine the applicable fine range yields the following analysis:

a.     The 2016 USSG are applicable to this matter.

b.     <u>Offense Level—Bribery Conduct (Highest Offense Level)</u>.  Based upon USSG § 2C1.1, the total offense level is 48, calculated as follows:

| | | |
|---|---|---|
| (a)(2) | Base Offense Level | 12 |
| (b)(1) | Multiple Bribes | +2 |
| (b)(2) | Value of Benefit more than $550,000,000 | +30 |
| (b)(3) | High Level Official Involved | +4 |
| **Total Offense Level** | | 48 |

c.     <u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(2), the base fine is $3.336 billion.

d.     <u>Culpability Score</u>.  Based upon USSG § 8C2.5 and 8C4.1, the culpability score is 9, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(1)(A)(i) | 5,000 or More Employees and Participation by High-Level Personnel | +5 |
| (e) | Obstruction of Justice | +3 |
| (g)(2) | Self-Disclosure and Cooperation | -2 |
| 8C4.1 | Substantial Assistance Against Others | -2 |
| **TOTAL** | | 9 |

Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $3.336 billion |
| Multipliers | 1.8 (min)/ 3.6 (max) |
| Fine Range | $6.0048 billion to $12.0096 billion |

21.     Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Fraud Section, EDNY and the Defendant agree that the following represents the appropriate disposition of the case:

a.     Disposition.  Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Fraud Section, EDNY and the Defendant agree that the appropriate disposition of this case is as set forth above, and agree to recommend jointly that the Court, at a hearing to be scheduled at an agreed upon time, impose a sentence requiring the Defendant to pay a criminal fine, as noted below. Specifically, the parties agree, based on the application of the United States Sentencing Guidelines, that the appropriate total criminal penalty is $4,503,600,000.  This reflects a 25 percent discount off of the bottom of the applicable Sentencing Guidelines fine range for the Defendant's full cooperation and remediation.

b.     The Defendant has made representations to the Fraud Section, EDNY and the Brazilian authorities that the Defendant has an inability to pay a criminal fine in excess of $2,600,000,000, including anticipated adjustments for exchange rates between the United States Dollar and the Brazilian Real and interest payments.  Based on those representations, the Defendant has agreed to a criminal penalty of $2,600,000,000 payable to the United States, Brazil, and Switzerland on the time schedule allotted by their respective agreements.

c.     The Fraud Section, EDNY and the Brazilian authorities will conduct an independent analysis to verify the accuracy of the Defendant's representations ("the Analysis"),

17

with such verification to be completed no later than March 31, 2017. Upon completion, if any additional amount is determined by the Fraud Section, EDNY and the Brazilian authorities to be available, consistent with the Defendant's ability to pay, such additional amount will be added to the total criminal penalty of $2,600,000,000 ("Total Criminal Penalty"). The Analysis will also verify the amounts the Defendant is able to pay as of June 30, 2017 and within five years of the date of the Agreement.

        d.     On June 30, 2017, the Defendant agrees to pay into an escrow account for the benefit of the United States Treasury an amount equal to 10 percent of the principal of the Total Criminal Penalty plus 10 percent of any interest that accrues on that amount between the date of the Agreement and the date of the payment, subject to the Analysis. On or before December 31, 2021, the Defendant will pay the Brazilian authorities at least an amount equal to 10 percent of the principal of the Total Criminal Penalty plus 10 percent of any interest that accrues from the date of the Agreement until December 31, 2021, subject to the Analysis. Both the principal and the interest amounts set forth in the Agreement will be determined by application of the Brazilian SELIC rate. The Defendant's payment obligations to the United States will be complete on June 30, 2017, so long as the Defendant pays the remaining amount of the Total Criminal Penalty to Brazil and Switzerland. The Total Criminal Penalty will be offset by the amount the Defendant pays to Brazil and Switzerland over the full term of their respective agreements. The Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty or disgorgement amounts that the Defendant pays pursuant to the Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts. The Defendant further acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total Criminal Penalty.

e.  Mandatory Special Assessment.  The Defendant shall pay to the Clerk of the Court for the United States District Court for the Eastern District of New York within 10 days of the time of sentencing the mandatory special assessment of $400.

22.  This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C).  The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated.  The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

23.  The Defendant, the Fraud Section and EDNY waive the preparation of a Pre-Sentence Investigation Report.  The Defendant understands that the decision whether to proceed with the sentencing proceeding without a Pre-Sentence Investigation Report is exclusively that of the Court.  In the event the Court directs the preparation of a Pre-Sentence Investigation Report, the Fraud Section and EDNY will fully inform the preparer of the Pre-Sentence Investigation Report and the Court of the facts and law related to the Defendant's case.  At the time of the plea hearing, the parties will suggest mutually agreeable and convenient dates for the sentencing.

<u>BREACH OF AGREEMENT</u>

24.  If the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraphs 11 and 12 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraph 9 of this Agreement and Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of the FCPA, would be a

19

violation of the FCPA; or (f) otherwise fails specifically to perform or to fulfill completely each of the Defendant's obligations under the Agreement, regardless of whether the Fraud Section and EDNY become aware of such a breach after the Term, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section and EDNY have knowledge, including, but not limited to, the charges in the Information described in Paragraph 3, which may be pursued by the Fraud Section, EDNY or any other United States Attorney's Office that has venue over the conduct.  Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Fraud Section and EDNY's sole discretion.  Any such prosecution may be premised on information provided by the Defendant or its personnel.  Any such prosecution relating to the conduct described in the Information and the attached Statement of Facts or relating to conduct known to the Fraud Section and EDNY prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term of the Agreement plus one year.  Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term of the Agreement plus one year.  The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement.  In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraph 11 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section

20

and EDNY are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

25.     In the event the Fraud Section and EDNY determine that the Defendant has breached this Agreement, the Fraud Section and EDNY agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach. Within 30 days of receipt of such notice, the Defendant shall have the opportunity to respond to the Fraud Section and EDNY in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Fraud Section and EDNY shall consider in determining whether to pursue prosecution of the Defendant.

26.     In the event that the Fraud Section and EDNY determine that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Fraud Section and EDNY or to the Court, including the Information and the Statement of Facts, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section and EDNY against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant

21

for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section and EDNY.

27.     The Defendant acknowledges that the Fraud Section and EDNY have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and this matter proceeds to judgment. The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

<u>PUBLIC STATEMENTS BY THE DEFENDANT</u>

28.     The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and the Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraphs 24 to 27 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Information or the Statement of Facts will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section and EDNY. If the Fraud Section and EDNY determine that a public statement by any such person contradicts in whole or in part a statement contained in the Information or the Statement of Facts, the Fraud Section and EDNY shall so notify the Defendant, and the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the

22

Information and the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

29.     The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates over which the Defendant exercises control issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Fraud Section and EDNY to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section, EDNY and the Defendant; and (b) whether the Fraud Section and EDNY have any objection to the release or statement.

## INDEPENDENT COMPLIANCE MONITOR

30.     Promptly after the Fraud Section and EDNY's selection pursuant to Paragraph 31 below, the Defendant agrees to retain the Monitor for the term specified in Paragraph 32. The Monitor's duties and authority, and the obligations of the Defendant with respect to the Monitor and the Fraud Section and EDNY, are set forth in Attachment D, which is incorporated by reference into this Agreement. No later than the date of execution of this Agreement, the Defendant will propose to the Fraud Section and EDNY a pool of three qualified candidates to serve as the Monitor. The parties will endeavor to complete the monitor selection process within 60 days of the execution of this agreement. The Monitor candidates or their team members shall have, at a minimum, the following qualifications:

a.     demonstrated expertise with respect to the FCPA and other applicable anti-corruption laws, including experience counseling on FCPA issues;

23

b. experience designing and/or reviewing corporate compliance policies, procedures and internal controls, including FCPA and anti-corruption policies, procedures and internal controls;

c. the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

d. sufficient independence from the Defendant to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

31. The Fraud Section and EDNY retain the right, in their sole discretion, to choose the Monitor from among the candidates proposed by the Defendant, though the Defendant may express its preference(s) among the candidates. If the Fraud Section and EDNY determine, in their sole discretion, that any of the candidates are not, in fact, qualified to serve as the Monitor, or if the Fraud Section and EDNY, in their sole discretion, are not satisfied with the candidates proposed, the Fraud Section and EDNY reserve the right to request that the Defendant nominate additional candidates. In the event the Fraud Section and EDNY reject all proposed Monitors, the Defendant shall propose an additional three candidates within 20 business days after receiving notice of the rejection. This process shall continue until a Monitor acceptable to both parties is chosen. The Fraud Section, EDNY and the Defendant will use their best efforts to complete the selection process within 60 calendar days of the execution of this Agreement. If, during the term of the monitorship, the Monitor becomes unable to perform his or her obligations as set out herein and in Attachment D, or if the Fraud Section and EDNY in their sole discretion determine that the Monitor cannot fulfill such obligations to the satisfaction of the Office, the Office shall notify the Defendant of the release of the Monitor, and the Defendant shall within 30 calendar days of such notice recommend a pool of three qualified Monitor candidates from which the Fraud Section and EDNY will choose a replacement.

24

32.     The Monitor's term shall be three years from the date on which the Monitor is retained by the Defendant, subject to extension or early termination as described in Paragraph 1. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachment D.  The Defendant agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires.  Nor will the Defendant discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term.

## COMPLETE AGREEMENT

33.     This document, including its attachments, states the full extent of the Agreement between the parties.  There are no other promises or agreements, express or implied.  Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

AGREED:

FOR ODEBRECHT S.A.:

_____         _____
Adriano Chaves Jucá Rolim               William Burck, Esq.
Attorney in Fact                        Richard Smith, Esq.
Odebrecht S.A.                          Eric Lyttle, Esq.
                                        Quinn Emanuel Urquhart & Sullivan, LLP
                                        Counsel to Odebrecht S.A.

Date:    12/21/16

FOR THE U.S. DEPARTMENT OF JUSTICE:

ROBERT CAPERS                           ANDREW WEISSMANN
United States Attorney                  Chief, Fraud Section
Eastern District of New York            Criminal Division
                                        U.S. Department of Justice


_____         _____
Alexandra Smith                         Christopher Cestaro
Julia Nestor                            David Last
Assistant U.S. Attorneys                David Fuhr
                                        Lorinda Laryea
                                        Kevin Gingras
                                        Trial Attorneys


Date:   December 21, 2016

## COMPANY OFFICER'S CERTIFICATE

I have read the plea agreement between Odebrecht S.A. (the "Defendant") and the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the Eastern District of New York (the "Agreement") and carefully reviewed every part of it with outside counsel for the Defendant. I understand the terms of the Agreement and voluntarily agree, on behalf of the Defendant, to each of its terms. Before signing the Agreement, I consulted outside counsel for the Defendant. Counsel fully advised me of the rights of the Defendant, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of the Agreement with those officers and members of the Defendant's Board of Directors with authorization to approve the Agreement. I have advised and caused outside counsel for the Defendant to advise those officers and members of the Defendant's Board of Directors with authorization to approve the Agreement fully of the rights of the Defendant, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in the Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing the Agreement on behalf of the Defendant, in any way to enter into the Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the

Attorney in Fact for the Defendant and that I have been duly authorized by the Defendant to

execute the Agreement on behalf of the Defendant.

Date: 12/21/16

ODEBRECHT S.A.

By: _____

Adriano Chaves Jucá Rolim
Attorney in Fact

CERTIFICATE OF COUNSEL

I am counsel for Odebrecht S.A. (the "Defendant") in the matter covered by the plea

agreement between the Defendant and the United States of America, by and through the

Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office

for the Eastern District of New York (the "Agreement"). In connection with such representation,

I have examined relevant documents and have discussed the terms of the Agreement with

those officers and members of the Defendant's Board of Directors with authorization to approve

the Agreement. Based on our review of the foregoing materials and discussions, I am of the

opinion that the representative of the Defendant has been duly authorized to enter into the

Agreement on behalf of the Defendant and that the Agreement has been duly and validly

authorized, executed, and delivered on behalf of the Defendant and is a valid and binding

obligation of the Defendant. Further, I have carefully reviewed the terms of the Agreement with

those officers and members of the Defendant's Board of Directors with authorization to approve

the Agreement. I have fully advised them of the rights of the Defendant, of possible defenses, of

the Sentencing Guidelines' provisions and of the consequences of entering into the Agreement.

To my knowledge, the decision of the Defendant to enter into the Agreement, based on the

authorization of the Board of Directors, is an informed and voluntary one.

Date: 12/21/16

By: _____
     William Burck, Esq.
     Richard Smith, Esq.
     Eric Lyttle, Esq.
     Quinn Emanuel Urquhart & Sullivan, LLP
     Counsel to Odebrecht S.A.

ATTACHMENT A

<u>CERTIFICATE OF CORPORATE RESOLUTIONS</u>

A copy of the executed Certificate of Corporate Resolutions is annexed hereto as "Exhibit 1."

# EXHIBIT 1



## POWER OF ATTORNEY

By this private Power of Attorney, **ODEBRECHT S.A.**, a company incorporated under the laws of Brazil, with its registered office at Av. Luis Viana, n. 2841, Paralela, Ed. Odebrecht, Salvador – BA, enrolled with the taxpayer registry (CNPJ/MF) under ▮▮▮▮▮▮▮▮ ("ODB"), represented hereby by its undersigned Officers, appoints and constitutes, as its lawful Attorney-in-fact, **ADRIANO CHAVES JUCÁ ROLIM**, Brazilian citizen, with Identity Card OAB/SP n. ▮▮▮▮▮, enrolled with the tax payer registry (CPF) under n. ▮▮▮▮▮▮▮▮, to execute and deliver, on behalf of ODB, a Certificate of Corporate Resolutions and related Officer's Certificate and any and all documents related to the plea agreement between ODB and the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the Eastern District of New York. The Attorney-in-Fact is allowed to perform any and all acts required for the true and full performance of this Power of Attorney, which shall be effective for three (3) months from the date hereof and cannot be substituted.

Sao Paulo, December 15, 2016.

**ODEBRECHT S.A.**

## ATTACHMENT B

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Plea

Agreement (the "Agreement") between the United States Department of Justice, Criminal

Division, Fraud Section (the "Fraud Section"), the United States Attorney's Office for the

Eastern District of New York (the "EDNY") and the defendant Odebrecht S.A.  Odebrecht S.A.

hereby agrees and stipulates that the following information is true and accurate.  Odebrecht S.A.

admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors,

employees, and agents as set forth below.  The Fraud Section and EDNY's evidence establishes

the following facts during the relevant time frame and proves beyond a reasonable doubt the

charges set forth in the Criminal Information filed in the United States District Court for the

Eastern District of New York pursuant to the Agreement:

### RELEVANT ENTITIES AND INDIVIDUALS

1.      Odebrecht S.A. was a Brazilian holding company that, through various operating

entities (collectively "Odebrecht" or the "Company"), conducted business in multiple industries,

including engineering, construction, infrastructure, energy, chemicals, utilities and real estate.

Odebrecht had its headquarters in Salvador, state of Bahia, Brazil, and operated in 27 other

countries, including the United States.

2.      Construtora Norberto Odebrecht ("CNO") was a Brazilian-based subsidiary of

Odebrecht S.A.  CNO was responsible for carrying out projects in Brazil related to transport and

logistics, energy, sanitation, urban development and public and corporate construction.  CNO

housed a unit called the Division of Structured Operations, which, as described below, was

B-1

created to allow Odebrecht to make unrecorded payments, many of which took the form of bribes to government officials in Brazil and abroad.

3.      Braskem S.A. ("Braskem"), a *sociedade anônima* (corporation) organized under the laws of Brazil and headquartered in São Paulo, Brazil, was one of the largest petrochemical companies in the Americas, producing a portfolio of petrochemical and thermoplastic products. Odebrecht S.A. owned 50.11% of the voting shares and 38.1% of the total share capital of Braskem and effectively controlled the company.  Petróleo Brasileiro S.A. – Petrobras ("Petrobras"), Brazil's national oil company, owned 36.1% of the shares of Braskem.  American depositary shares of Braskem traded on the New York Stock Exchange, and Braskem was required to file annual reports with the United States Securities and Exchange Commission (the "SEC") under Section 15(d) of the Exchange Act, Title 15, United States Code, Section 78o(d). Braskem was an "issuer" as that term is used in the Foreign Corrupt Practices Act (the "FCPA"), Title 15, United States Code, Sections 78dd-1(a) and 78m(b).

4.      Smith & Nash Engineering Company ("S&N"), an unaffiliated shell company based in the British Virgin Islands, was established and managed at the Division of Structured Operations' direction.  S&N was used by Odebrecht to further the bribery scheme, and to conceal and disguise improper payments made to, and for the benefit of, foreign officials and foreign political parties in various countries.  S&N opened at least one offshore bank account (the "S&N Account") on behalf of Odebrecht.  Odebrecht transferred money from various bank accounts, including several New York-based bank accounts (the "New York-based Accounts"), to the S&N Account.  The funds in the S&N Account were then used, in part, to make direct and indirect bribe payments to foreign officials.  A United States citizen and resident of New York and Florida was the authorized signatory on the S&N Account.

5.      Arcadex Corporation ("Arcadex") was an unaffiliated shell company incorporated in Belize.  Arcadex was established and managed at the Division of Structured Operations' direction and used by Odebrecht to further the bribery scheme, and to conceal and disguise improper payments made to, and for the benefit of, foreign officials and foreign political parties in various countries.  Arcadex opened at least one offshore bank account (the "Arcadex Account") on behalf of Odebrecht.  Odebrecht transferred money from various bank accounts, including the New York-based Accounts, to the Arcadex Account.  The funds in the Arcadex Account were then used, in part, to make direct and indirect bribe payments to foreign officials.

6.      Golac Projects and Construction Corporation ("Golac") was an unaffiliated shell company incorporated in the British Virgin Islands.  Golac was established and managed at the Division of Structured Operations' direction and used by Odebrecht to further the bribery scheme, and to conceal and disguise corrupt payments made to, and for the benefit of, foreign officials and foreign political parties in various countries.  Golac opened at least one offshore bank account (the "Golac Account") on behalf of Odebrecht.  Odebrecht transferred money from various bank accounts, including the New York-based Accounts, to the Golac Account.  The funds in the Golac Account were then used, in part, to make direct and indirect bribe payments to foreign officials.

7.      "Odebrecht Employee 1," a citizen of Brazil whose identity is known to the United States and the Company, was an officer and senior executive of Odebrecht S.A. in or about and between January 2009 and December 2015 and an officer and senior executive of CNO in or about and between January 2002 and January 2010.  Odebrecht Employee 1 was also a director of Braskem in or about and between 2009 and December 2015.

B-3

8.     "Odebrecht Employee 2," a citizen of Brazil whose identity is known to the United States and the Company, was a senior executive in the Division of Structured Operations, in or about and between 2006 and 2015, and reported directly to Odebrecht Employee 1. Odebrecht Employee 2 operated the Division of Structured Operations to account for and disburse payments that were not included in Odebrecht's publicly-declared financials, including corrupt payments made to, or for the benefit of, foreign officials and foreign political parties in order to obtain and retain business for Odebrecht.

9.     "Odebrecht Employee 3," a citizen of Brazil whose identity is known to the United States and the Company, was an executive of the Division of Structured Operations from approximately 2006 to 2015. Odebrecht Employee 3 reported to Odebrecht Employee 2 and was responsible for overseeing corrupt payments made in Brazil and abroad. In or about 2014 and 2015, while located in Miami, Florida, Odebrecht Employee 3 engaged in criminal conduct in furtherance of the scheme, including meetings with other co-conspirators to plan actions to be taken in connection with the Division of Structured Operations and the movement of criminal proceeds.

10.     "Odebrecht Employee 4," a citizen of Brazil whose identity is known to the United States and the Company, was the Division of Structured Operations executive in charge of financial operations for complex and large payments made by the Division of Structured Operations outside of Brazil from approximately 2006 to 2015. Odebrecht Employee 4 also helped Odebrecht Employee 3 oversee the corrupt payments made by the Division of Structured Operations in Brazil. In or about 2014 and 2015, while located in Miami, Florida, Odebrecht Employee 4 engaged in conduct in furtherance of the scheme, including meetings with other co-

B-4

conspirators to plan actions to be taken in connection with the Division of Structured Operations and the movement of criminal proceeds.

11.     "Odebrecht Employee 5," a citizen of Brazil whose identity is known to the United States and the Company, was a high-level executive of CNO from approximately 1997 to 2007. Thereafter, from approximately 2008 to 2010, Odebrecht Employee 5 held an officer position at CNO in the industrial works area, and in or about 2011 Odebrecht Employee 5 became a Corporate Leader within CNO. He remained in that position until approximately 2015. As the primary contact between Odebrecht and Petrobras between approximately 2004 and 2012, Odebrecht Employee 5 oversaw the negotiation and payment of bribes by Odebrecht to Petrobras officials to obtain and retain business with Petrobras.

12.     "Odebrecht Employee 6," a citizen of Brazil whose identity is known to the United States and the Company, was a high-level executive of the international area of the engineering division of Odebrecht from approximately 2008 to 2015. Odebrecht Employee 6 reported to Odebrecht Employee 1 and was responsible for overseeing Odebrecht's Superintendent Directors, or country leaders, of Angola and several Latin American countries. As part of that supervision, Odebrecht Employee 6 approved many of the corrupt payments to foreign officials and foreign political parties outside of Brazil.

13.     Petrobras was a Brazilian state-controlled oil company, and a minority shareholder in Braskem. Petrobras was headquartered in Rio de Janeiro, Brazil, and operated to refine, produce and distribute oil, oil products, gas, biofuels and energy. The Brazilian government directly owned approximately 50.3% of Petrobras's common shares with voting rights, while an additional 10% of the corporation's shares were controlled by the Brazilian Development Bank and Brazil's Sovereign Wealth Fund. Petrobras was an "agency" and

B-5

"instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-3(f)(2)(A).

14.     "Brazilian Official 1," an individual whose identity is known to the United States and the Company, was an executive and director at Petrobras.  Brazilian Official 1 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

15.     "Brazilian Official 2," an individual whose identity is known to the United States and the Company, was an executive and director at Petrobras.  Brazilian Official 2 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

16.     "Brazilian Official 3," an individual whose identity is known to the United States and the Company, was a manager at Petrobras.  Brazilian Official 3 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

17.     "Brazilian Official 4," an individual whose identity is known to the United States and the Company, was a high-level state elected official in Brazil.  Brazilian Official 4 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

18.     "Brazilian Official 5," an individual whose identity is known to the United States and the Company, was a high-level official in the legislative branch of government in Brazil. Brazilian Official 5  was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

B-6

## OVERVIEW OF THE BRIBERY SCHEME

19.     In or about and between 2001 and 2016, Odebrecht, together with its co-conspirators, knowingly and willfully conspired and agreed with others to corruptly provide hundreds of millions of dollars in payments and other things of value to, and for the benefit of, foreign officials, foreign political parties, foreign political party officials and foreign political candidates to secure an improper advantage and to influence those foreign officials, foreign political parties and foreign political candidates in order to obtain and retain business in various countries around the world.

20.     During the relevant time period, Odebrecht, together with its co-conspirators, paid approximately $788 million in bribes in association with more than 100 projects in twelve countries, including Angola, Argentina, Brazil, Colombia, Dominican Republic, Ecuador, Guatemala, Mexico, Mozambique, Panama, Peru and Venezuela.

21.     To further the criminal bribery scheme, Odebrecht and its co-conspirators created and funded an elaborate, secret financial structure that operated to account for and disburse corrupt bribe payments to, and for the benefit of, foreign officials, foreign political parties, foreign political party officials and foreign political candidates.  Over time, the development and operation of this secret financial structure evolved, and in or about 2006, Odebrecht established the Division of Structured Operations, a standalone division within the Company.  The Division of Structured Operations effectively functioned as a bribe department within Odebrecht and its related entities.  To conceal its activities, the Division of Structured Operations utilized an entirely separate and off-book communications system called "Drousys," which allowed members of the Division of Structured Operations to communicate with one another and with

outside financial operators and other co-conspirators about the bribes through the use of secure emails and instant messages, utilizing codenames and passwords.

22.     Odebrecht and its employees and agents took a number of steps while in the territory of the United States in furtherance of the corrupt scheme. For example, some of the offshore entities used by the Division of Structured Operations to hold and disburse unrecorded funds were established, owned and/or operated by individuals located in the United States. In addition, at times during the conspiracy, individuals working in the Division of Structured Operations, including Odebrecht Employee 3, Odebrecht Employee 4 and others, took steps in furtherance of the bribery scheme while located in the United States. For example, in or about 2014 and 2015, while located in Miami, Florida, Odebrecht Employee 3 and Odebrecht Employee 4 engaged in conduct related to certain projects in furtherance of the scheme, including meetings with other co-conspirators to plan actions to be taken in connection with the Division of Structured Operations, the movement of criminal proceeds and other criminal conduct.

23.     In all, Odebrecht, together with its co-conspirators, paid more than $788 million in bribes to illegally secure projects in multiple countries – including, as described below, corrupt payments to Petrobras employees and executives; corrupt payments to other government officials in Brazil; and corrupt payments to foreign officials in eleven other countries – with ill-gotten benefits[1] to Odebrecht and its co-conspirators of approximately $3.336 billion.

_____

[1] The term "benefit" as used in this Statement of Facts relates to any profits earned on a particular project for which a profit was generated as the result of a bribe payment. For projects that resulted in profits to Odebrecht that were less than the amount of the associated bribe payment, the amount of the bribe payment was used to calculate the "benefit."

**THE DIVISION OF STRUCTURED OPERATIONS AND**
**THE MANNER AND MEANS OF THE CONSPIRACY**

24.     The Division of Structured Operations was led by Odebrecht Employee 2 and

staffed by other Odebrecht employees and/or agents (including Odebrecht Employee 3 and

Odebrecht Employee 4) who worked with a series of financial operators or *doleiros* (also known

as money traders, who functioned to exchange Brazilian Reais for American dollars).  Odebrecht

Employee 2 reported to Odebrecht Employee 1, who was responsible for approving corrupt

payments made by the Division of Structured Operations until approximately 2009, and who,

thereafter, received updates of the payments made by the Division of Structured Operations.

After approximately 2009, Odebrecht Employee 1 delegated the responsibility for approving the

corrupt payments to the business leaders in Brazil and the various country leaders in the other

jurisdictions.

25.     The Division of Structured Operations managed its "shadow" budget via two

computer systems: (i) the "MyWebDay" system, which was used for making payment requests,

processing payments, and generating and populating spreadsheets that tracked and internally

accounted for the shadow budget; and (ii) the "Drousys" system, which allowed members of the

Division of Structured Operations to communicate with one another and with outside financial

operators and other co-conspirators using secure emails and instant messages.  To conceal their

corrupt activities, users of the Drousys system utilized a series of codenames to mask their

identities, and referred to bribe recipients and intermediaries using additional codes and

passwords.

26.     To further conceal the Company's criminal conduct, the Division of Structured

Operations managed and distributed funds that Odebrecht never recorded on its balance sheet.

These "unrecorded funds" were generated by Odebrecht through a variety of methods, including

but not limited to: (i) standing overhead charges collected from subsidiaries; (ii) overcharges and fees that were attributed as legitimate to service providers and subcontractors but not included in project budgets; (iii) undeclared retainers and success fees for the purchase of company assets; and (iv) self-insurance and self-guarantee transactions.

27.     Once generated, unrecorded funds were funneled by the Division of Structured Operations to a series of offshore entities that were not included on Odebrecht's balance sheet as related entities.  These entities were established and managed at the Division of Structured Operations' direction by beneficial owners who were compensated for opening and, in some cases, operating these entities.  Odebrecht used these offshore entities to further the bribery scheme, and to conceal and disguise improper payments made to, or for the benefit of, foreign officials, foreign political parties, foreign political party officials and foreign political candidates in various countries.  Many of the transactions were layered through multiple levels of offshore entities and bank accounts throughout the world, often transferring the illicit funds through up to four levels of offshore bank accounts before reaching the final recipient.  In this regard, members of the conspiracy sought to distance the origin of the funds from the final beneficiaries.

28.     The funds were disbursed from the offshore entities at the Division of Structured Operations' direction.  These disbursements were made by financial operators who acted on Odebrecht's behalf, including but not limited to the beneficial owners of the accounts and *doleiros*, who delivered the payments in cash both inside and outside Brazil in packages or suitcases at locations predetermined by the beneficiary of the funds; or made the payments via wire transfer through one or more of the offshore entities.

29.     In furtherance of the bribery scheme and to facilitate the movement of illicit funds, Odebrecht and its co-conspirators also utilized banks with distinct features that would aid

B-10

in the scheme: specifically, smaller banks located in countries with strict laws regarding the protection of bank secrecy and the sharing of information with international law enforcement. To ensure the cooperation of these favored banks, Odebrecht and its co-conspirators frequently paid remuneration fees and higher rates to the banking institutions, and a percentage of each illicit transaction to certain complicit bank executives. The Division of Structured Operations counted on the collusion of the favored banks and their executives to conduct the transfers between accounts, largely relying on the use of fictitious contracts to backstop the transactions and bypass compliance inquiries. Certain co-conspirators, such as Odebrecht Employee 4, visited the countries where the final beneficiaries were located and brought them to the favored banks to open accounts to facilitate the illicit payment transfers.

30.     After a particular favored bank located in Antigua began to falter, members of the conspiracy, including former executives with the faltering bank, purchased the Antiguan branch of an Austrian bank in or about 2010 or 2011. By virtue of this acquisition, other members of the conspiracy, including senior politicians from multiple countries receiving bribe payments, could open bank accounts and receive transfers without the risk of raising attention. By acquiring the bank, members of the conspiracy, including Odebrecht Employee 4 and others, willfully facilitated the illegal payment scheme. They also actively participated in obtaining fictitious contracts to support the operations of the Division of Structured Operations and responded directly to compliance issues in order to allow operations to be authorized.

31.     Odebrecht caused wire transfers to be made to these and other bank accounts created by these offshore entities from Odebrecht-related bank accounts, including from several New York-based Accounts held by CNO.

B-11

**CORRUPT PAYMENTS TO GOVERNMENT OFFICIALS IN BRAZIL**

32.     Beginning in at least as early as 2003 and continuing through approximately 2016, Odebrecht caused approximately $349 million in corrupt bribe payments to be made to political parties, foreign officials, and their representatives, in Brazil, in order to secure an improper advantage to obtain and retain business for Odebrecht.  Odebrecht benefited more than $1.9 billion as a result of these corrupt payments.

*Corrupt Payments to Obtain and Retain Business with Petrobras*

33.     Beginning in or about 2004 and continuing through at least 2012, Odebrecht agreed to make, and caused to be made, corrupt payments to, and for the benefit of, foreign officials, including Brazilian politicians and Petrobras executives and employees, in order to secure contracts with Petrobras.

34.     As part of the scheme, Odebrecht participated in a series of meetings with other construction companies to evaluate and divide up future contracts for Petrobras projects among the companies (together, the "Cartel Companies").  Once it was determined which company or companies should be responsible for a certain project, as well as the price that Petrobras felt was appropriate for the particular project, it was agreed that only the predetermined company would present a qualifying bid, and that the other Cartel Companies would present proposals that would ensure the predetermined company's winning bid.  In this manner, the Cartel Companies rotated the available Petrobras contracts between them.

35.     Certain executives of Petrobras involved in awarding the projects on behalf of Petrobras were aware of the Cartel Companies' bid rigging, and in order to guarantee the continued success of the bid rigging scheme and to secure the contracts with Petrobras,

B-12

Odebrecht and the other Cartel Companies agreed to make corrupt payments to, and for the benefit of, these Petrobras executives, other Brazilian politicians and political parties.

36.     For example, in or about October 2010, Odebrecht bid for and won a Petrobras contract for the provision of various environmental and security certification services that were necessary for various activities that Petrobras undertook abroad.  In order to win the contract, Odebrecht agreed to pay bribes that would be forwarded to Brazilian political parties.  Odebrecht Employee 5 met with certain of the Cartel Companies, all of which agreed that Odebrecht would get the contract; two of the Cartel Companies also agreed to provide proposals in such a way that would ensure that Odebrecht would win the bid.  Odebrecht directed more than $40 million to certain Brazilian political parties from its Division of Structured Operations using unrecorded funds in connection with the project; and certain of the funds were paid directly to specific government officials.

37.     Odebrecht caused numerous illicit payments to be made from United States-based bank accounts to perpetuate its bribe scheme in Brazil.  For example, between at least December 2006 and December 2007, Odebrecht caused transfers totaling almost $40 million to be made from the New York-based Accounts to the S&N Account.  Thereafter, in or between January and August 2011, Odebrecht used the S&N Account to make bribe payments, including paying approximately $3.5 million and almost 2 million Swiss Francs to the bank account of an offshore entity controlled by Brazilian Official 1, then an executive at Petrobras.

38.     Similarly, in or about December 2009, Odebrecht caused transfers totaling approximately $20 million to be made from the New York-based Accounts to the Arcadex Account.  Before and contemporaneously with the transfers from the New York-based Accounts, Odebrecht caused numerous money transfers to be made from the Arcadex Account to a second

Arcadex account (the "Second Arcadex Account") that was used to make bribe payments, including an approximately $430,000 bribe payment to a bank account controlled by Brazilian Official 2, then an executive at Petrobras.

39.     Furthermore, in or about December 2008, Odebrecht caused transfers totaling almost $48 million to be made from the New York-based Accounts to the Golac Account. Thereafter, in or about and between December 2008 and July 2010, Odebrecht caused transfers from the Golac Account to three unrelated accounts in Panama and Antigua from which approximately $10 million was transferred to the accounts of three then-Petrobras executives Brazilian Official 1, Brazilian Official 2 and Brazilian Official 3.

### *Corrupt Payments to Obtain and Retain Other Business in Brazil*

40.     In addition to the corrupt payments to secure contracts with Petrobras, Odebrecht made and caused to be made corrupt payments to political parties, individual candidates and other government officials at the local, regional and national level in Brazil with unrecorded funds from the Division of Structured Operations in order to obtain and retain other business in Brazil.

41.     For example, Odebrecht made and caused to be made corrupt payments to Brazilian officials with unrecorded funds in order to secure a transportation project in Brazil. Odebrecht was not part of the original group of companies awarded the project, but ultimately purchased the rights to participate in the project.  Subsequently, Odebrecht agreed to make payments to Brazilian Official 4, a high-level state elected official in Brazil, in exchange for Brazilian Official 4's assistance in ensuring Odebrecht's continued work on the project. Between approximately 2010 and 2014, Odebrecht, through the Division of Structured Operations, made payments in Brazilian Reais (totaling more than $20 million) to Brazilian

Official 4 and other foreign officials in connection with the project. Odebrecht profited approximately $184 million from the project.

42.     Similarly, in or about 2011, Brazilian Official 5, a high-level official within the legislative branch of government in Brazil, requested that Odebrecht make payments to a political party in exchange for the party's influence to continue a construction project in Rio de Janeiro from which Odebrecht stood to benefit. In or about and between 2011 and 2014, Odebrecht, through the Division of Structured Operations, made payments in Brazilian Reais (totaling approximately $9.7 million) to Brazilian Official 5, as did other companies involved in the project, in order to ensure future contributions to the project from certain government groups. Odebrecht profited approximately $142 million from the project.

## CORRUPT PAYMENTS TO FOREIGN OFFICIALS
## AND POLITICAL PARTIES IN OTHER COUNTRIES

43.     In or about and between 2001 and 2016, Odebrecht made and caused to be made approximately $439 million in corrupt payments to foreign political parties, foreign officials, and their representatives, in countries outside of Brazil, including Angola, Argentina, Colombia, the Dominican Republic, Ecuador, Guatemala, Mexico, Mozambique, Panama, Peru and Venezuela, in order to secure an improper advantage to obtain and retain business for Odebrecht in those countries. Odebrecht benefited more than $1.4 billion as a result of these corrupt payments.

44.     Odebrecht made and caused to be made the majority of these corrupt payments to government officials; third parties associated with, and for the benefit of, government officials; and political parties or campaigns. All of the corrupt payments were made to secure an improper advantage for Odebrecht to obtain and retain business. Typically, the Division of Structured Operations executed the corrupt payments using unrecorded funds, either (i) in cash in the

country in question, or (ii) by deposits into accounts indicated by the ultimate beneficiaries or their intermediaries.

45.     In or about and between 2008 and 2015, Odebrecht's corporate structure in Latin America was organized such that the senior-most country leaders reported to Odebrecht Employee 6, who was the Business Leader for Angola[2] and the above-referenced countries in Latin America, except Venezuela.

### *Angola*

46.     In or about and between 2006 and 2013, Odebrecht made and caused to be made more than $50 million in corrupt payments to government officials in Angola in order to secure public works contracts.  Odebrecht realized benefits of approximately $261.7 million as a result of these corrupt payments.

47.     For example, beginning in or about 2006, Odebrecht Employee 6 caused the Company to make approximately $8 million in corrupt payments to an Angolan government official to obtain infrastructure projects in Angola.  Odebrecht also paid another approximately $1.19 million to a high-level official of an Angolan state-owned and state-controlled company to obtain business.  The bribe payments were generally made with unrecorded funds and coordinated through the Division of Structured Operations.

### *Argentina*

48.     In or about and between 2007 and 2014, Odebrecht made and caused to be made more than $35 million in corrupt payments to intermediaries with the understanding that these payments would be passed, in part, to government officials in Argentina.  The corrupt payments

---

[2] In July 2012, after a restructuring, Odebrecht Employee 6 no longer had oversight in Angola, but continued to have oversight in Latin America.

were made in association with at least three infrastructure projects, and Odebrecht realized benefits of approximately $278 million.

49.     For example, in 2008, prior to a bid on government projects being finalized, Odebrecht agreed that, in order to secure the contracts, Odebrecht and others would commit to making a future payment to undisclosed government officials in Argentina in an unspecified amount.  In or about and between 2011 and 2014, the Company, through the Division of Structured Operations, made payments totaling approximately $2.9 million to an intermediary with the understanding that the intermediary would pass the payments to Argentinian government officials.

50.     Thereafter, in or about and between January 2011 and March 2014, Odebrecht made additional corrupt payments through the Division of Structured Operations totaling approximately $500,000 to private accounts at the direction of an intermediary, with the understanding that the payments were for the benefit of Argentinian government officials.

### *Colombia*

51.     In or about and between 2009 and 2014, Odebrecht made and caused to be made more than $11 million in corrupt payments in Colombia in order to secure public works contracts.  The Company realized benefits of more than $50 million as a result of these corrupt payments.

52.     For example, in or about and between 2009 and 2010, Odebrecht agreed to pay, and later paid through the Division of Structured Operations with Odebrecht Employee 6's authorization, a $6.5 million bribe to a government official in charge of awarding a construction project with the Colombian government in exchange for assistance with winning the project.

B-17

*The Dominican Republic*

53.     In or about and between 2001 and 2014, Odebrecht made and caused to be made more than $92 million in corrupt payments to government officials and intermediaries working on their behalf in the Dominican Republic.  Odebrecht realized benefits of more than $163 million as a result of these corrupt payments.

54.     For example, in order to secure certain public works contracts in the Dominican Republic, Odebrecht paid bribes to an intermediary responsible for interfacing with the government with the understanding that the intermediary would pass the money, in part, to government officials.  Most of the payments were made with unrecorded funds from the Division of Structured Operations with the authorization of Odebrecht Employee 6.  Through this agreement, Odebrecht was able to influence governmental budget and financing approvals for certain projects in the Dominican Republic.

*Ecuador*

55.     In or about and between 2007 and 2016, Odebrecht made and caused to be made more than $33.5 million in corrupt payments to government officials in Ecuador.  Odebrecht realized benefits of more than $116 million as a result of these corrupt payments.

56.     For example, in or about and between 2007 and 2008, Odebrecht experienced a number of problems related to a construction contract, and agreed with an intermediary to an Ecuadorian government official with control over public contracts to make corrupt payments to the government official to solve the problems.  Odebrecht later delivered these payments in cash to the government official.

B-18

*Guatemala*

57.    In or about and between 2013 and 2015, Odebrecht made and caused to be made approximately $18 million in corrupt payments to government officials in Guatemala in order to secure public works contracts. Odebrecht realized benefits of more than $34 million as a result of these corrupt payments.

58.    For example, in relation to an infrastructure project awarded to Odebrecht, the Company agreed to pay a high-ranking Guatemalan government official a percentage of the value of the contract over the life of the project in exchange for the official assisting Odebrecht with obtaining payments under the contract. Odebrecht made approximately $11.5 million in corrupt payments, through the Division of Structured Operations and with Odebrecht Employee 6's approval, to companies designated by the Guatemalan official.

*Mexico*

59.    In or about and between 2010 and 2014, Odebrecht made and caused to be made approximately $10.5 million in corrupt payments to government officials in Mexico in order to secure public works contracts. Odebrecht realized benefits of more than $39 million as a result of these corrupt payments.

60.    For example, in or about October 2013, Odebrecht agreed to pay a bribe to a high-level official of a Mexican state-owned and state-controlled company in exchange for the official assisting the Company with winning a project. In or about and between December 2013 and late 2014, Odebrecht, through the Division of Structured Operations, paid the official $6 million.

*Mozambique*

61.    In or about and between 2011 and 2014, Odebrecht made and caused to be made approximately $900,000 in corrupt payments to government officials in Mozambique.

62.     The corrupt payments included approximately $250,000 in payments to a high-level government official in Mozambique in exchange for Odebrecht obtaining favorable terms on a government construction project, which the government had not been inclined to accept before Odebrecht offered to make the corrupt payment.  Odebrecht made these payments in installments of $135,000 and $115,000 with the Division of Structured Operations' unrecorded funds from an offshore company.

*Panama*

63.     In or about and between 2010 and 2014, Odebrecht made and caused to be made more than $59 million in corrupt payments to government officials and intermediaries working on their behalf in Panama in order to secure, among other things, public works contracts. Odebrecht realized benefits of more than $175 million as a result of these corrupt payments.

64.     For example, in or about and between 2009 and 2012, Odebrecht agreed to pay $6 million to two close relatives of a high-level Panamanian government official in connection with government infrastructure projects, with the understanding that, in exchange for the payments, the government official would ensure Odebrecht's participation in and payment under the contracts.  In order to effectuate the corrupt payments, Odebrecht utilized the Division of Structured Operations to make payments in unrecorded funds to offshore companies designated by the Panamanian government official and intermediaries.

*Peru*

65.     In or about and between 2005 and 2014, Odebrecht made and caused to be made approximately $29 million in corrupt payments to government officials in Peru in order to secure public works contracts.  Odebrecht realized benefits of more than $143 million as a result of these corrupt payments.

B-20

66.     For example, in or about 2005, Odebrecht participated in a tender for a government infrastructure project.  During the tender process, an Odebrecht employee was approached by an intermediary of a high-level official in the Peruvian government, who offered to support Odebrecht's bid, if, in the event that Odebrecht was awarded the project, it would make corrupt payments benefiting the government official.  The payments were agreed to be paid through companies owned by an intermediary who had a relationship with the government official.  After the initial conversations with the intermediary, the Odebrecht employee participated in several meetings, some of which were attended by the government official.  Odebrecht won the tender and made corrupt payments totaling approximately $20 million from approximately 2005 to 2008 to specific companies, as directed by the intermediary, with unrecorded funds from the Division of Structured Operations.

67.     Furthermore, in or about 2008, Odebrecht bid on a government transportation contract in Peru.  In order to influence the bid committee to help Odebrecht secure the contract, Odebrecht agreed to pay $1.4 million to a high-level official in the Peruvian government and members of the tender committee for the project.  In or about 2009, Odebrecht won the contract, valued at approximately $400 million.  Odebrecht made the corrupt payments, which were approved by Odebrecht Employee 6, with unrecorded funds from the Division of Structured Operations.

### *Venezuela*

68.     In or about and between 2006 and 2015, Odebrecht made and caused to be made approximately $98 million in corrupt payments to government officials and intermediaries working on their behalf in Venezuela in order to obtain and retain public works contracts.

69.     Odebrecht typically used intermediaries to negotiate contracts with government officials on behalf of the Company.  Odebrecht understood that these intermediaries would pay bribes to government officials on behalf of the Company in order to influence the allocation of resources to Odebrecht projects, to obtain confidential pricing and bidding information in connection with those projects, and to obtain and retain contracts for those projects.  Generally, these intermediaries charged a percentage of the contract price in connection with their work on behalf of the Company.

70.     For example, Odebrecht paid an intermediary to help it obtain contracts with a Venezuelan state-owned and state-controlled company.  During the negotiations, the intermediary made it clear that the money would be used to pay a bribe in exchange for obtaining certain service agreements and amendments, and that the intermediary represented various directors of the state-owned and state-controlled company.  Odebrecht paid the intermediary approximately $39 million.

## OBSTRUCTION OF JUSTICE

71.     In or about 2014, Brazilian law enforcement authorities began an initially covert investigation into corruption related to Petrobras, called Lavo Jato or "Operation Carwash." Thereafter, related investigations were launched in the United States and Switzerland.  After Odebrecht became aware of Lavo Jato and related investigations, certain individuals – including Odebrecht Employee 1 and employees and executives involved in the Division of Structured Operations – took steps to conceal or destroy evidence of criminal activities, and to hinder the various investigations.  These steps included, but were not limited to, a directive from Odebrecht Employee 1 to Odebrecht employees to delete records that might reveal illegal activities.

72.     Furthermore, in or about mid-2015, Odebrecht Employee 4 attended a meeting in Miami, Florida, with a consular official from Antigua and an intermediary to a high-level government official in Antigua.  In order to conceal Odebrecht's corrupt activities, Odebrecht Employee 4 requested that the high-level official refrain from providing to international authorities various banking documents that would reveal illicit payments made by the Division of Structured Operations on behalf of Odebrecht, and agreed to pay $4 million to the high-level official to refrain from sending the documents.  Odebrecht Employee 3 made three payments of 1 million Euros on behalf of Odebrecht in order to secure the deal.  The contemplated fourth payment was never made.

73.     Furthermore, in or about January 2016, after Lavo Jato and the investigations by United States and Swiss authorities were well-known to Odebrecht, employees and/or agents of the Company intentionally caused the destruction of physical encryption keys needed to access the MyWebDay system, which contained evidence relating to the bribery scheme.  As a result of these actions, significant evidence from the MyWebDay system was rendered inaccessible.

ATTACHMENT C

CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws, Odebrecht S.A. (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*High-Level Commitment*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws and its compliance code.

C-1

*Policies and Procedures*

2.      The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts (collectively, the "anti-corruption laws,"), which policy shall be memorialized in a written compliance code.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company.  These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.  Such policies and procedures shall address:

        a.      gifts;

        b.      hospitality, entertainment, and expenses;

        c.      customer travel;

        d.      political contributions;

        e.      charitable donations and sponsorships;

   f.  facilitation payments; and

   g.  solicitation and extortion.

  4.  The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts.  This system should be designed to provide reasonable assurances that:

   a.  transactions are executed in accordance with management's general or specific authorization;

   b.  transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

   c.  access to assets is permitted only in accordance with management's general or specific authorization; and

   d.  the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

  5.  The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses

C-3

and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

6.     The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

7.     The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance code, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8.     The Company will implement mechanisms designed to ensure that its anti-corruption compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b)

C-4

corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

9.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

### Internal Reporting and Investigation

10.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

11.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

### Enforcement and Discipline

12.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's anti-corruption compliance code, policies, and procedures by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee.  The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Relationships*

14.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.     informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's anti-corruption compliance code, policies, and procedures; and

c.     seeking a reciprocal commitment from agents and business partners.

15.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are

C-6

reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include: (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's compliance code, policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

16.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

17.     The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

      a.     train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

      b.     where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring and Testing*

18.     The Company will conduct periodic reviews and testing of its anti-corruption compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's anti-corruption code, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.

C-8

ATTACHMENT D

INDEPENDENT COMPLIANCE MONITOR

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of Odebrecht S.A. (the "Company"), on behalf of itself and its subsidiaries and affiliates, with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Eastern District of New York (collectively the "Department"), are as described below:

1.    The Company will retain the Monitor for a period of three years (the "Term of the Monitorship"), unless the early termination provision of Paragraph 1 of the Plea Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2.    The Monitor's primary responsibility is to assess and monitor the Company's compliance with the terms of the Agreement, including the Corporate Compliance Program in Attachment C, so as to specifically address and reduce the risk of any recurrence of the Company's misconduct.  During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the internal accounting controls, record-keeping, and financial reporting policies and procedures of the Company as they relate to the Company's current and ongoing compliance with the FCPA and other applicable anti-corruption laws (collectively, the "anti-corruption laws") and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate").  This Mandate shall include an assessment of the Board of Directors' and senior management's commitment to, and effective

D-1

implementation of, the corporate compliance program described in Attachment C of the Agreement.

*Company's Obligations*

3.      The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's compliance program in accordance with the principles set forth herein and applicable law, including applicable data protection and labor laws and regulations. To that end, the Company shall: facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 5-6; and provide guidance on applicable local law (such as relevant data protection and labor laws). The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement. The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third-party vendors, agents, and consultants.

4.      Any disclosure by the Company to the Monitor concerning corrupt payments, false books and records, and internal accounting control failures shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Department, pursuant to the Agreement.

*Withholding Access*

5.      The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor. In the event that the Company seeks to withhold from the Monitor

access to information, documents, records, facilities, or current or former employees of the

Company that may be subject to a claim of attorney-client privilege or to the attorney work-

product doctrine, or where the Company reasonably believes production would otherwise be

inconsistent with applicable law, the Company shall work cooperatively with the Monitor to

resolve the matter to the satisfaction of the Monitor.

6.      If the matter cannot be resolved, at the request of the Monitor, the Company shall

promptly provide written notice to the Monitor and the Department.  Such notice shall include a

general description of the nature of the information, documents, records, facilities or current or

former employees that are being withheld, as well as the legal basis for withholding access.  The

Department may then consider whether to make a further request for access to such information,

documents, records, facilities, or employees.

*Monitor's Coordination with the
Company and Review Methodology*

7.      In carrying out the Mandate, to the extent appropriate under the circumstances,

the Monitor should coordinate with Company personnel, including in-house counsel, compliance

personnel, and internal auditors, on an ongoing basis.  The Monitor may rely on the product of

the Company's processes, such as the results of studies, reviews, sampling and testing

methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the

Company's internal resources (e.g., legal, compliance, and internal audit), which can assist the

Monitor in carrying out the Mandate through increased efficiency and Company-specific

expertise, provided that the Monitor has confidence in the quality of those resources.

8.      The Monitor's reviews should use a risk-based approach, and thus, the Monitor is

not expected to conduct a comprehensive review of all business lines, all business activities, or

D-3

all markets.  In carrying out the Mandate, the Monitor should consider, for instance, risks

presented by: (a) the countries and industries in which the Company operates; (b) current and

future business opportunities and transactions; (c) current and potential business partners,

including third parties and joint ventures, and the business rationale for such relationships; (d)

the Company's gifts, travel, and entertainment interactions with foreign officials; and (e) the

Company's involvement with foreign officials, including the amount of foreign government

regulation and oversight of the Company, such as licensing and permitting, and the Company's

exposure to customs and immigration issues in conducting its business affairs.

   9. In undertaking the reviews to carry out the Mandate, the Monitor shall formulate

conclusions based on, among other things:  (a) inspection of relevant documents, including the

Company's current anti-corruption policies and procedures; (b) on-site observation of selected

systems and procedures of the Company at sample sites, including internal accounting controls,

record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant

current and, where appropriate, former directors, officers, employees, business partners, agents,

and other persons at mutually convenient times and places; and (d) analyses, studies, and testing

of the Company's compliance program.

<em>Monitor's Written Work Plans</em>

   10. To carry out the Mandate, during the Term of the Monitorship, the Monitor shall

conduct an initial review and prepare an initial report, followed by at least two follow-up reviews

and reports as described in Paragraphs 16-19 below.  With respect to the initial report, after

consultation with the Company and the Department, the Monitor shall prepare the first written

work plan within 60 calendar days of being retained, and the Company and the Department shall

D-4

provide comments within 30 calendar days after receipt of the written work plan. With respect to each follow-up report, after consultation with the Company and the Department, the Monitor shall prepare a written work plan at least 30 calendar days prior to commencing a review, and the Company and the Department shall provide comments within 20 calendar days after receipt of the written work plan. Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Department in its sole discretion.

11.    All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement. In developing such understanding the Monitor is to rely to the extent possible on available information and documents provided by the Company. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*Initial Review*

12.    The initial review shall commence no later than 120 calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the Department). The Monitor shall issue a written report within 150 calendar days of commencing the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's program

for ensuring compliance with the anti-corruption laws. The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them. The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices, but rather may focus on those areas with respect to which the Monitor wishes to make recommendations, if any, for improvement or which the Monitor otherwise concludes merit particular attention. The Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit copies to the Deputy Chief – FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, at 1400 New York Avenue N.W., Bond Building, Eleventh Floor, Washington, D.C. 20005 and Chief, Business and Securities Fraud Section, United States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York 11201. After consultation with the Company, the Monitor may extend the time period for issuance of the initial report for a brief period of time with prior written approval of the Department.

13. Within 150 calendar days after receiving the Monitor's initial report, the Company shall adopt and implement all recommendations in the report, unless, within 60 calendar days of receiving the report, the Company notifies in writing the Monitor and the Department of any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that

recommendation within the 150 calendar days of receiving the report but shall propose in writing to the Monitor and the Department an alternative policy, procedure or system designed to achieve the same objective or purpose.  As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within 45 calendar days after the Company serves the written notice.

14.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Department.  The Department may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement.  Pending such determination, the Company shall not be required to implement any contested recommendation(s).

15.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within 150 calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Department.

*Follow-Up Reviews*

16.     A follow-up review shall commence no later than 180 calendar days after the issuance of the initial report (unless otherwise agreed by the Company, the Monitor and the Department).  The Monitor shall issue a written follow-up report within 120 calendar days of commencing the follow-up review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the initial review.  After consultation with the Company, the Monitor may extend the time period for

D-7

issuance of the follow-up report for a brief period of time with prior written approval of the Department.

17.     Within 120 calendar days after receiving the Monitor's follow-up report, the Company shall adopt and implement all recommendations in the report, unless, within 30 calendar days after receiving the report, the Company notifies in writing the Monitor and the Department concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable.  With respect to any such recommendation, the Company need not adopt that recommendation within the 120 calendar days of receiving the report but shall propose in writing to the Monitor and the Department an alternative policy, procedure, or system designed to achieve the same objective or purpose.  As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within 30 calendar days after the Company serves the written notice.

18.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Department.  The Department may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement.  Pending such determination, the Company shall not be required to implement any contested recommendation(s).  With respect to any recommendation that the Monitor determines cannot reasonably be implemented within 120 calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Department.

D-8

19.     The Monitor shall undertake a second follow-up review not later than 150 calendar days after the issuance of the first follow-up report. The Monitor shall issue a second follow-up report within 120 days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16-18.  No later than 60 days before the end of the Term, the Monitor shall submit to the Department a final written report ("Certification Report"), setting forth an overview of the Company's remediation efforts to date, including the implementation status of the Monitor's recommendations, and an assessment of the sustainability of the Company's remediation efforts.  No later than 30 days before the end of the Term, the Monitor shall certify whether the Company's compliance program, including its policies and procedures, is reasonably designed and implemented to prevent and detect violations of the anti-corruption laws.

*Monitor's Discovery of Potential or Actual Misconduct*

20.     (a)     Except as set forth below in sub-paragraphs (b), (c) and (d), should the Monitor discover during the course of his or her engagement that:

- improper payments or anything else of value may have been offered, promised, made, or authorized by any entity or person within the Company or any entity or person working, directly or indirectly, for or on behalf of the Company; or

- the Company may have maintained false books, records or accounts; or

(collectively, "Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Company's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed.  The

D-9

Monitor also may report Potential Misconduct to the Department at any time, and shall report Potential Misconduct to the Department when it requests the information.

(b)     In some instances, the Monitor should immediately report Potential Misconduct directly to the Department and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Department and not to the Company, namely, where the Potential Misconduct: (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)     If the Monitor believes that any Potential Misconduct actually occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Department.  When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Department, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Company should occur as the Department and the Monitor deem appropriate under the circumstances.

(d)     The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Department or not.  Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the

Department and address the Company's failure to disclose the necessary information in his or her reports.

(e)     The Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

21.     The Monitor shall meet with the Department within 30 calendar days after providing each report to the Department to discuss the report, to be followed by a meeting between the Department, the Monitor, and the Company.

22.     At least annually, and more frequently if appropriate, representatives from the Company and the Department will meet together to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Department, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

23.     The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Department determines in its sole discretion that disclosure would be in furtherance of the Department's discharge of its duties and responsibilities or is otherwise required by law.

D-11